**In re NASDAQ MARKET–MAKERS ANTITRUST LITIGATION.**

M.D.L. No. 1023.
No. Civ.94–3996(RWS).

United States District Court,
S.D. New York.

Nov. 9, 1998.

Arthur M. Kaplan, Fine Kaplan and Black, Philadelphia, PA, Christopher Lovell, Lovell & Stewart, New York City, Robert A. Skirnick, Meredith Cohen Greenfogel & Skirnick, New York City, Leonard B. Simon, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA, for Plaintiffs.

Howard Schiffman, R. Bruce Holcomb, Dickstein Shapiro Morin & Oshinsky, Washington, DC, John L. Warden, Sullivan & Cromwell, New York City, Jay N. Fastow, Well, Gotshal & Manges, New York City, for Defendants.

## OPINION

SWEET, Senior District Judge.

Plaintiffs in this multidistrict antitrust litigation class action have moved, pursuant to Fed.R.Civ.P. 23(e), for an order granting final approval of the settlement agreements between the parties filed with this Court on or before March 24, 1998 (the "Proposed Settlements") and Plaintiffs' class counsel ("Class Counsel") have moved for an order awarding attorneys' fees and for reimbursement of expenses over certain objections. Class member John Genins ("Genins") has moved to intervene and/or to be named as an additional class representative.

Upon the findings and conclusions set forth below, the motion to approve the Proposed Settlements is granted. Class Counsel is awarded fees of 14.0 percent of the common fund[1] plus full reimbursement of expenses and Genins' motion is denied.

### The Issues

> Words are the tokens current and accepted for conceits, as moneys are for values.

Francis Bacon, *Advancement of Learning*, xvi 3 (Oxford Univ. Press, 1906) (1605).

These motions raise issues of both conceits and values and require a determination as to the fairness and adequacy of the Proposed Settlements and the appropriate fees to be granted to Class Counsel. The Proposed Settlements call for the payment by the Defendants of $1,027,000,000, an amount characterized as the largest antitrust class action

recovery to date, and Class Counsel have sought fees in the amount of $179,725,000.

To resolve these issues and values with respect to approval of the Proposed Settlements, consideration will be given to the prior proceedings, the Proposed Settlements, and the standards to be applied in approving a settlement. Factors to be considered include whether or not the settlement process was fair, adequate and reasonable, including the relative strength of the Plaintiffs' case and the defense, the significance of termination of the litigation at this stage, the likelihood of a litigated judgment, the opposition to the settlement, the solvency of the Defendants, and an overall evaluation of the litigation.

The conceits which must be considered in determining the value of the services of Class Counsel include consideration of alternative methods of determining fees, the percentage and lodestar methods, the factors to be considered in setting the fee, and an evaluation of those factors under both methods.

While approval of the settlement follows a well-marked channel, fee determination in megafund class litigation requires more artful navigation to avoid the dangers of an arbitrary *ad hoc* decision. Both issues are complex and challenging in the context of this hard fought and significant litigation.

### Prior Proceedings

Plaintiffs are a class of over 1.0 million individual and institutional investors who purchased or sold shares of class securities on the NASDAQ from one or more Defendants or their commonly owned affiliates during the period of May 1, 1989 to May 24, 1994 (the "Plaintiffs").

The 37 defendants (the "Defendants") in this action are all market-makers on the National Association of Securities Dealers Automated Quotation system ("NASDAQ") exchange, a computerized securities quotations system operated by the National Association of Securities Dealers ("NASD").

Plaintiffs' complaint in this action alleged violations of the Sherman Act, 15 U.S.C. § 1,

---

1. Attorneys fees will total $143,780,000.

arising out of price fixing of spreads and stocks traded on the NASDAQ exchange. The initial action was filed in May, 1994 after the publication of a study entitled "Why do NASDAQ Market Makers Avoid Odd Eighth Quotes," by Professors William G. Christie and Paul H. Schultz published in the December issue of *The Journal Of Finance.* Thereafter, more than two dozen additional actions were filed in this court and others. These actions were assigned by the Multi District Litigation Panel to this court.

Orders were entered to preserve evidence and a civil investigation was launched by the Antitrust Division of the Department of Justice which culminated in a consent decree approved by this court on April 22, 1996, *United States v. Alex. Brown & Sons, Inc.,* 963 F.Supp. 235, *aff'd* 153 F.3d 16 (2d Cir. 1998).

Discovery, class certification, and various issues were resolved in the proceedings previously reported, familiarity with which is assumed. *See, In re Nasdaq Market–Makers Antitrust Litigation,* 894 F.Supp. 703 (S.D.N.Y.1995); *In re NASDAQ Market–Makers Antitrust Litigation,* 164 F.R.D. 346 (S.D.N.Y.1996); *In re NASDAQ Market–Makers Antitrust Litigation,* 1996 WL 187409, 1996–1 Trade Cas. (CCH) ¶ 71,407 (S.D.N.Y.1996); *In re NASDAQ Market–Makers Antitrust Litigation,* 929 F.Supp. 723 (S.D.N.Y.1996); *In re NASDAQ Market Makers Antitrust Litigation,* 929 F.Supp. 174 (S.D.N.Y.1996); *In re NASDAQ Market Makers Antitrust Litigation,* 938 F.Supp. 232 (S.D.N.Y.1996); *In re NASDAQ Market Makers Antitrust Litigation,* 169 F.R.D. 493 (S.D.N.Y.1996); *United States v. Alex. Brown & Sons,* 169 F.R.D. 532 (S.D.N.Y. 1996); *In re NASDAQ Market Makers Antitrust Litigation,* 172 F.R.D. 119 (S.D.N.Y. 1997); *In re Nasdaq Market–Makers Antitrust Litigation,* 176 F.R.D. 99, 1997 WL 639240 (S.D.N.Y. Oct.16, 1997); *United States v. Alex. Brown & Sons,* 963 F.Supp. 235 (S.D.N.Y.1997); *In re Nasdaq Market–Makers Antitrust Litigation,* 176 F.R.D. 99 (S.D.N.Y.1997); *In re NASDAQ Market*

*Makers Antitrust Litigation,* 894 F.Supp. 703, 1995–2 Trade Cas. (CCH) ¶ 72,028 (S.D.N.Y.1997).

Class Counsel reviewed certain of the discovery provided to the Government, including 3.0 million pages of documents and 10,000 hours of audiotapes and more than 200 depositions.

On October 14, 1997, December 31, 1997, and March 30, 1998, the Court preliminarily approved the Proposed Settlement between the Plaintiffs and various Defendants. Following preliminary approval, and pursuant to orders entered on February 4, 1998 and March 30, 1998, a Notice of Pendency of Class Action and of Proposed Settlements ("Class Notice") approved by the Court was mailed to more than a million class members. Pursuant to those same orders, a summary notice was published in the *Wall Street Journal,* the *New York Times, USA Today,* as well as 35 local newspapers, and in periodicals such as *Barron's, Business Week, Forbes, Fortune,* and *Worth,* as well as on an Internet website and online investor services. Class members were advised of the existence and terms of the Proposed Settlements and the fee application of Class Counsel and apprised of their right to opt-out or object to the settlement and the proposed fees and expenses, by filing and serving written objection by July 14, 1998.[2]

On September 8, 1998, Genins moved to intervene and become an additional class representative.

A hearing was held on September 9, 1998. Objectors were heard with respect to the fee application and certain administrative details. No objections were made with respect to the amount of the Proposed Settlements.

### The Proposed Settlements

According to Plaintiffs, this all-cash settlement, achieved through "four years of hard-fought litigation", apparently is the largest recovery (class action or otherwise) in the hundred year history of the state and federal antitrust laws.[3]

---

**2.** Time to opt-out was later enlarged until September 29, 1998.

**3.** The $634,900,000 antitrust settlement in *ETSI Pipeline Project, et al. v. Burlington Northern Inc., et al.,* C.A. No. B–84–979 (E.D.Tex.) was the

The first settlement in this litigation was with defendant Sherwood Securities Corp. ("Sherwood"). It required Sherwood to pay a total of $9,187,500.00 in cash, plus 7.25% interest on a deferred portion of this principal, all of which has now been paid into an interest bearing escrow account. This principal amount was negotiated on the basis of $4.375 million per percentage point of market share.

The second settlement was with defendant Kidder, Peabody & Co., Incorporated and totalled $14,625,000.00 in cash which has been paid into an interest-bearing escrow account. This represented $5.625 million per percentage point of market share.

The third settlement was with defendant Herzog, Heine Geduld, Inc. ("Herzog") and totalled $30,604,454.50 in cash. Under this settlement, defendant Herzog paid exactly 25% of its net capital at the close of its most recent quarter, and has represented by affidavit that any greater payment would cause financial hardship and competitive harm.

The fourth settlement was with defendant Jefferies & Company, Inc. and totalled $10,312,500.00 in cash, which has been paid into an interest-bearing escrow account. This settlement was negotiated on the basis of $6.875 million per percentage point of market share.

The fifth settlement was with defendant Cantor Fitzgerald & Co. and totalled $14,700,000.00 in cash, plus 7.25% interest on a deferred portion of this principal, all of which

has been paid into an interest-bearing escrow account. This principal amount was negotiated on the basis of $7.5 million per percentage point of market share.

The sixth settlement was with defendant Montgomery Securities and totalled $20,000,000.00 in cash, plus 7.25% interest on a deferred portion of this principal, all of which has been paid into an interest-bearing escrow account. This principal amount represented approximately $8.25 million per percentage point of market share.[4]

The group settlement with thirty of the remaining defendants was achieved on December 23, 1997.[5] It totals $909,867,925.00, including $25,000,000.00 in cash which has been paid into an interest-bearing escrow account, and $884,867,925.00 in U.S. Treasury securities (valued at maturity on or before July 30, 1999), which will be deposited into an escrow account on or before September 30, 1998.[6]

The final settlement with defendant BankAmerica Robertson Stephens (successor to Robertson, Stephens & Company) ("Robertson Stephens") totals $17,000,000.00. Of this amount, $500,000.00 in cash has been paid into an interest-bearing escrow account; and the remaining $16,500,000.00 will be paid on or before July 30, 1999 (guaranteed by BankAmerica Corporation).[7]

The Proposed Settlements provide for aggregate payments by all 37 defendants, which, including interest, will total approxi-

---

largest antitrust recovery known to Class Counsel prior to the recovery here.

**4.** These six settlements were preliminarily approved by the Court on October 16, 1997. *In re Nasdaq Market–Makers Antitrust Litigation,* 176 F.R.D. 99, 1997 WL 639240 (S.D.N.Y. Oct. 16, 1997).

**5.** The defendants in the group settlement are: A.G. Edwards & Sons, Inc.; Bear Stearns & Co., Inc.; BT Alex. Brown Incorporated; CIBC Oppenheimer Corp.; Cowen & Company; Credit Suisse First Boston Corporation; Dean Witter Reynolds Inc.; Donaldson, Lufkin & Jenrette Securities Corporation; EVEREN Securities, Inc. (f/k/a Kemper Securities, Inc.); Furman Selz LLC; Goldman, Sachs & Co.; Hambrecht & Quist LLC; J.C. Bradford Company LLC; J.P. Morgan Securities, Inc.; Legg Mason Wood

Walker, Incorporated; Lehman Brothers Inc.; Mayer & Schweitzer, Inc.; Merrill Lynch, Pierce, Fenner & Smith, Incorporated; Morgan Stanley & Co. Incorporated; Nash, Weiss & Co.; OLDE Discount Corporation; PaineWebber Incorporated; Piper, Jaffray Inc.; Prudential Securities Incorporated; The Robinson–Humphrey Company, Inc.; Salomon Brothers Inc.; Smith Barney Inc.; Spear, Leeds & Kellogg, LP (Troster Singer); UBS Securities LLC; Weeden & Co., L.P.; and Weeden Securities Corp.

**6.** This settlement was preliminarily approved by the Court on December 31, 1997. *In re NASDAQ Market Makers Antitrust Litigation,* 172 F.R.D. 119 1997–1 Trade Cas. (CCH) ¶ 72,028 (S.D.N.Y. 1997).

**7.** The Robertson Stephens' settlement was preliminarily approved by the Court on March 30, 1998.

mately $1,027,000,000.00 (before deductions for fees and expenses) by the anticipated time of distribution in 1999.

Each settlement expressly provides that no funds whatsoever shall revert to any defendant, following final settlement approval. Moreover, there is no cap on the individual recoveries by class members in any of the settlements. Following settlement approval, the settlements provide that Plaintiffs' Co–Lead Counsel shall propose a plan of distribution to the Court, together with any necessary claims form.

## Discussion

### I. Standards for Judicial Approval of a Settlement

■ Fed.R.Civ.P. 23 provides that "[a] class action shall not be dismissed or compromised without the approval of the court." The decision to grant or deny such approval lies within the discretion of the trial court, *see In re Ivan F. Boesky Sec. Litig.*, 948 F.2d 1358, 1368 (2d Cir.1991); *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir.1972), and this discretion should be exercised in light of the general judicial policy favoring settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982) (3 Neuberg, *Class Actions* § 5570c at 479–80 (1977)); *In re Michael Milken & Assoc. Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y.1993); *Chatelain v. Prudential–Bache Sec., Inc.*, 805 F.Supp. 209, 212 (S.D.N.Y.1992).

■ It is well-established that courts' principal responsibility in approving class action settlements is to ensure that such settlements are fair adequate and reasonable. *See e.g.*, *Weinberger*, 698 F.2d at 73 ("The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate."); *In re*

*PaineWebber Limited Partnerships Litigation*, 171 F.R.D. 104, 124 (S.D.N.Y.1997).

■ This determination "involves consideration of two types of evidence." *Weinberger*, 698 F.2d at 73. The Court's primary concern is with "the substantive terms of the settlement compared to the likely result of a trial," *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983), and to that end "the trial judge must apprise himself of all the facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim[s] be litigated." *Weinberger*, 698 F.2d at 74. (internal citations omitted).

■ The Second Circuit has held that nine factors are generally considered in determining the fairness of a proposed settlement:

(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974) ("*Grinnell I*").[8]

■ The Court's second concern is with the "negotiating process by which the settlement was reached," *Weinberger*, 698 F.2d at 73, which must be examined "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or

---

**8.** Other Circuits have enumerated similar factors for consideration of proposed settlements. *See e.g.*, *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir.1982) (settlement should balance several factors, which may include some or all of the following: strength of plaintiffs' case; risk, expense, complexity, and likely duration of further litigation; risk of maintaining class action status; amount offered in settlement; extent of discovery completed and stage of proceedings; experience and views of counsel; presence of governmental par-

ticipant; and reaction of class members to proposed settlement); *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir.1982) (enumerating six factors to be considered: (1) whether settlement was product of fraud or collusion; (2) complexity, expense and likely duration of trial; (3) stage of proceedings and amount of discovery completed; (4) factual and legal obstacles to prevailing on merits; (5) possible range of recovery and certainty of damages; and (6) respective opinions of the participants).

collusion that may have marred the negotiations themselves." *Malchman,* 706 F.2d at 433 (citing *Weinberger,* 698 F.2d at 73). The court has a fiduciary duty to ensure that the settlement is not the product of collusion. *See In re Warner Communications Securities Litigation,* 798 F.2d 35, 37 (2d Cir.1986). So long as the integrity of the arm's length negotiation process is preserved, however, a strong initial presumption of fairness attaches to the proposed settlement, *see Chatelain,* 805 F.Supp. at 212, and "great weight" is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation. *Id.*

Here as in other previously approved class action settlements, the first focus is on the procedural fairness of the settlement process considering the initial three factors of *Grinnell I,* then on its overall adequacy and reasonableness, assessing the relative strength of the plaintiffs' action, including the remaining *Grinnell I* factors, all of which are referred to below. *See Maywalt v. Parker & Parsley Petroleum,* 864 F.Supp. 1422, 1427 (S.D.N.Y.1994); *States of New York & Maryland v. Nintendo of Am., Inc.,* 775 F.Supp. 676, 681 (S.D.N.Y.1991).

### A. The Settlements Were Achieved in Good Faith and at Arm's Length

■ A fair settlement should be the result of good faith, arm's length bargaining undertaken by experienced counsel. *Nintendo,* 775 F.Supp. at 680–81; *see also Weinberger,* 698 F.2d at 74; *Grinnell I,* 495 F.2d at 463–66. Counsel for the Plaintiffs are preeminent in the field of class action litigation, and the roster of counsel for the Defendants includes some of the largest, most successful and well regarded law firms in the country. It is difficult to conceive of better representation than the parties to this action achieved.

As demonstrated by the opinions cited above, the parties strenuously litigated the issues of the adequacy of the complaint, discovery, class certification and definition for over three years.

Similarly, the negotiations seeking settlements were ongoing over the period of the litigation but became more focused and in-

tensive after the initial settlement in the fall of 1997. There were a series of negotiations with Defendants, both individually and collectively. Over a dozen sessions were conducted with Court supervision concluding with the final settlement approved December 31, 1997.

The process by which the parties reached the Proposed Settlements was arms-length and hard fought by skilled advocates and negotiators. It was exemplary, fair and honest.

### B. The Settlements are Adequate and Reasonable

■ In determining the adequacy and reasonableness of a proposed settlement the following factors are primary and encompass the *Grinnell I* consideration:

(1) the relative strength of plaintiffs' case on the merits, including the existence of any difficulties of proof or strong defense the plaintiffs are likely to encounter if the case goes to trial; (2) the anticipated duration and expense of additional litigation; (3) the solvency of the defendants and the likelihood of recovery on a litigated judgment; and (4) the degree of opposition to the settlement.

*Nintendo,* 775 F.Supp. at 681–82.

#### 1. The Relative Strength of Plaintiff's Case and Difficulties of Proof

##### a. The Risks of Not Establishing Liability

Even in its broadest outline, liability in this case requires proof of an unusually complex conspiracy involving 37 Defendants and a "checkerboard" of fact situations and disparate periods for each of 1,659 different securities. Other liability issues include proof of a "common motive", "actions which were against" Defendants' "own individual business interest", and "evidence of coercion". *In re Nasdaq Market–Makers Antitrust Litigation,* 894 F.Supp. 703, 713–14 (S.D.N.Y. 1995).

Notably, the Class does not have the benefit of a prior conviction here, because the Department of Justice chose not to bring a

criminal proceeding. Nor does the Class have the benefit of an admissible civil judgment, because the Department of Justice settled its case on July 17, 1996 by consent decree on the very day it was brought. The resulting judgment is a "consent judgment" for the purposes of the Clayton Act, 15 U.S.C. § 15(a), and therefore it does not establish a *prima facie* case, nor collateral estoppel, in private actions brought on the same issues. *See, e.g., In re Shopping Carts Antitrust Litigation,* 1984–1 Trade Cas. (CCH) ¶ 65,823 at p. 67,444 (S.D.N.Y.1983).[9]

Class Counsel maintain that they have developed a strong body of evidence on liability but acknowledge the difficulties of proof. From the fact that the Antitrust Division filed a civil complaint, rather than (as is usual with price fixing) criminal indictments an inference may be drawn that the Department of Justice recognized the difficulty of establishing antitrust relief and was content to achieve the remedial measures contained in its consent decree.

Further, Plaintiffs recognize the difficulty and uncertainty of proving liability to a jury, especially in a case of this complexity and magnitude involving 1,659 different securities. Antitrust litigation in general, and class action litigation in particular, is unpredictable. *See e.g., In re PaineWebber,* 171 F.R.D. at 126 ("[l]itigation inherently involves risks."). Here an industry practice evolved over a period of at least three decades giving rise to a possible defense of conscious parallelism. Prominent economists have argued that there was no conspiracy; and that a conspiracy could not possibly succeed given the structure of this industry with hundreds of market-makers. They argued, moreover, that the absence of odd-eighth quotations reflected an ordinary, entirely innocent phenomenon: namely, the convenience of using round numbers.

Many economists continue to argue that conspiratorial conversations were merely sporadic or anecdotal; that the structure of the market permitting entry of many market makers inherently would not support successful price fixing.

As held in another antitrust case in this District, "[i]t is known from past experience that no matter how confident one may be in the outcome of litigation, such confidence is often misplaced." *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 743–44 (S.D.N.Y.1970), *aff'd,* 440 F.2d 1079 (2d Cir. 1971). In that opinion, the Honorable Inzer Wyatt offered the following example:

> In *Upson v. Otis,* 155 F.2d 606 (2d Cir. 1946), approval of a settlement was reversed, the Court saying: "on the facts presented to the district judge, the liability of the individual defendants was indubitable and the amount of recovery beyond doubt greater than that offered in the settlement. Accordingly, it was an abuse of discretion to approve the settlement." The action was then tried and plaintiffs obtained a judgment, twice considered by the Court of Appeals. We are told, however, that "the ultimate recovery ... turned out to be substantially less than the amount of the rejected compromise."

*Id.* Citations omitted.[10]

#### b. *The Risks of Not Establishing Damages*

In contrast to their confidence in the relative strength of their evidence regarding liability, Class Counsel "candidly concede" that there are numerous and substantial risks regarding proof of substantial damages.

Defendants have consistently argued that Plaintiffs would be unable to prove any damages whatsoever, particularly in light of allegedly offsetting rebates of commissions on

---

9. The SEC to date has not sued any of the Defendants in relation to the matters alleged in this litigation. It has only sued, and entered into a consent decree with, the National Association of Securities Dealers ("NASD"), which owns and regulates Nasdaq.

10. Recurrently, when some of the largest members of antitrust classes have opted-out of the class to try to do better than the class, they have failed to establish impact or other elements of liability, and have lost their cases at trial. This occurred, for example, in the *Corrugated Container Antitrust Litigation,* and most recently in the *Carbon Dioxide Antitrust Litigation. See, e.g., In re Corrugated Container Antitrust Litigation,* 1983–2 Trade Cas. (CCH) ¶ 65,628 at 69,157 (S.D.Tex.1983).

Nasdaq trades and the number of securities involved. The widespread skepticism with which this litigation was greeted in the financial and economic community is well-documented.[11]

Economists have argued that any differences between Nasdaq spreads and stock exchange spreads are attributable to differences in commissions, or structural differences between Nasdaq and the stock exchanges; and that for all of these reasons there are no damages whatsoever. *See* Susan E. Woodward, "Price Fixing at Nasdaq? A Reconsideration of the Evidence", Contract No. 96–0228, Congressional Budget Office, July, 1997. Henceforth referred to as the "Woodward Report."

Plaintiffs note that there is a substantial risk that a jury might accept one or more of Defendants' damage arguments, and award far less than the $1.027 billion settlement amount, or nothing at all. Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal. *See, e.g., United States Football League v. National Football League,* 644 F.Supp. 1040, 1042 (S.D.N.Y.1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages"), *aff'd,* 842 F.2d 1335, 1377 (2d Cir.1988); *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1166–69 (7th Cir.1983) (antitrust judgment was remanded for a new trial and damages).

Damages at trial inevitably would involve a "battle of the experts." As the Court observed in *In re Warner Communications,* "Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages.... In this 'battle of experts,' it is difficult to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad of non-actionable factors...." 618 F.Supp. at 744–45.

### c. The Risks of Not Maintaining the Class Action through Trial, or on Appeal

The opinion of this Court on class certification, and its subsequent opinion on institutional investor issues, reflect the multitude of issues, defenses and arguments marshalled by Defendants against what they termed "unprecedented certification." *See, In re NASDAQ Market–Makers Antitrust Litigation,* 169 F.R.D. at 501–529, *In re NASDAQ Market-Makers Antitrust Litigation,* 172 F.R.D. 119, 124–130 (S.D.N.Y.1997).

For example, on the issue of class member standing, there are a variety of individual class member situations involving intermediary brokers or investment advisors, which might at trial present cumbersome issues (especially while simultaneously proving a checkerboard pattern of conspiracy and injury for disparate months for each of 1,659 Class Securities). *Id.* 169 F.R.D. at 505–506.

As previously indicated, there is no guarantee that this class would not be decertified before or during trial. As the Court expressly noted in its opinion certifying the class, if "insurmountable management problems were to develop at any point, class certification can be revisited at any time under Fed.R.Civ.P. 23(c)(1)". *In re NASDAQ Market–Makers Antitrust Litigation,* 169 F.R.D. at 529. Intervening appellate decisions in other cases likewise might require such action.

---

**11.** *See, e.g.,* "Market Place: The Battle of the Studies: Is There Competition at Nasdaq?", *New York Times,* April 6, 1995. Nearly a year after the instant cases were filed, the *New York Times* favorably summarized various industry-sponsored studies:

"There is much less here than meets the eye" said Merton Miller, the Nobel Prize-winning economist from the University of Chicago.... He said a study by him and four colleagues found similar clustering [at round numbers] in several foreign markets.... Dean Furbush of Economics Inc. .... argued that "the market structure makes any collusion inconceivable." He pointed to the large number of market makers and the ease of entry into the business, as proof.... Allan Kleidon of the Stanford Law School and Robert D. Willig, a Princeton economist ... concluded that competitive economic factors accounted for the evident discrepancies found by Mr. Christie and Mr. Schultz....

As Plaintiffs correctly assert, if the Class were to be decertified at trial, or if class certification were to be reversed on appeal, the class members (other than a few dozen plaintiffs) would recover nothing at all.

### 2. *The Anticipated Duration and Expense of Additional Litigation*

As noted by the Honorable Charles L. Brieant, "antitrust price fixing actions are generally complex, expensive and lengthy." *In re Shopping Carts Antitrust Litigation,* 1984–1 Trade Cas. (CCH) ¶ 65,823 at 67,443, 1983 WL 1950, (S.D.N.Y.1983) citing *Grinnell I,* 495 F.2d at 467–68. Indeed, class actions "have a well deserved reputation as being most complex", *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.1977), and this multidistrict antitrust action is particularly complicated.

The proof would involve the fixing of spreads, not on a single security for a single discrete period, but the fixing of spreads varying from hour to hour or day to day (over a period of 7 years) on 1,659 different securities. In addition there are intricate regulatory rules that govern Defendants' conduct, such as "excess spread" rules, as well as the effect of complicated ancillary practices involving limit orders, payment for order flow, and preference agreements. There can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result.

Defendants' 1997 motion to dismiss the entire case, based upon preemption and the comprehensive regulation of their industry was outstanding at the time the Proposed Settlements were reached. Although Plaintiffs do not believe that Defendants' preemption motion would have been granted, they acknowledge that it is indicative of the many hurdles that lay ahead, not only at trial, but on the inevitable appeals.

Plaintiffs maintain that the trial itself, and the remaining discovery before trial, would have been a "Herculean undertaking." For example, the admissibility at trial of several hundred deposition transcripts obtained from the Government would be a hotly disputed issue. Alternatively, each of those several hundred depositions would have to be retaken before trial.

Defendants almost certainly would have pursued extensive pretrial and post-trial motions, including but not limited to motions for summary judgment and motions *in limine. See In re Gulf Oil,* 142 F.R.D. at 591 (case made even more complex by "attendant pretrial order, laborious winnowing of proof before trial, and post-trial skirmishing.").

The trial of this action after complete discovery would be lengthy and difficult and could consume over a year. Given the number of defendants and the diversity of their activities and the factors already noted, any verdict, two or three years from now, would be subject to appeal and possible reversal or retrial.

Not only would a trial of these issues be complicated, lengthy and expensive, these uncertainties are multiplied by the Supreme Court's recent holding in *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). At this writing it is impossible to determine where and how many times and in what jurisdiction these issues would be tried if all but the Southern District's actions must be transferred back to the jurisdictions of original filing. The resulting uncertainties as noted in *A Catalyst for Reforming Self-Transfer in Multi District Litigation: Lexacon, Inc. v. Milberg Weiss,* 72 St. John's L.Rev. 623, makes these Proposed Settlements not only reasonable but highly desirable from the point of view of all litigants.

These factors weigh in favor of the Proposed Settlements. As the district court in *Slomovics v. All for a Dollar, Inc.,* 906 F.Supp. 146, 149 (E.D.N.Y.1995) concluded, "[t]he potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interest of the Class."

### 3. *The Solvency of the Defendants and the Likelihood of Recovery on a Litigated Judgment*

While it appears that Defendants, which include some of Wall Street's most successful firms, would be able to pay a very substantial

judgment collectively, that fact does not militate against settlement. *In re PaineWebber,* 171 F.R.D. at 129 ("the fact that a defendant is able to pay more than it offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate"). Moreover, even the current settlements push the limits of ability to pay as to several of the Defendants. For example, defendant Herzog, Heine, Geduld, Inc. ("Herzog") and defendant Weeden & Co., L.P. each have represented to the Court that their settlement payments are approximately 25% of their total net worth; and Herzog further represented by affidavit that any greater payment would cause financial hardship. Another defendant, Nash, Weiss & Co., represented that its settlement payments exceed its entire net worth.

Plaintiffs assert that, after comparing spreads on Class Securities to spreads elsewhere, with appropriate regressions to eliminate extraneous non-conspiratorial factors, the best realistic damages (assuming full success on all issues at trial) average approximately four to five cents a share, amounting to a possible recovery of $2.48 billion to $3.1 billion prior to trebling. *See* Barclay Aff. This figure does not, however, take into account the various substantial offsets which economists contend would reduce any damages. According to the Woodward Report, for example, lower commissions entirely offset any comparative difference in spreads. Thus, Dr. Woodward concludes that there are no damages.[12]

It does appear that as a result of waiver or reduction of commissions, the best available damages at trial may well be lower than the four to five cent range estimated by Plaintiffs. Although Plaintiffs contend that Dr. Woodward overstates the extent of any offset, it is not inconceivable that a jury would accept Dr. Woodward's analysis, concluding that the commission reductions or waivers in the aggregate totally offset damages.

Ultimately, the exact amount of damages need not be adjudicated for purposes of settlement approval. As noted in one prominent antitrust case, the "essence of a settlement is compromise. A just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322, 1325 (5th Cir.1981). As held by this Court in *Air Line Pilots Association v. American National Bank and Trust Company of Chicago,* 156 B.R. 414 (S.D.N.Y.1993), "[T]he weighing of a claim against compensation cannot be ... exact. Nor should it be, since an exact judicial determination of the values in issue would defeat the purpose of compromising the claim...." 156 B.R. at 431.

In comparing the uncertain damages recoverable at trial, or trials, to the recovery that class members will achieve through this settlement, it is worth noting that the Proposed Settlements are structured so that there is no cap on the per share recovery, and expressly is structured so that there cannot be any reversion of funds to any Defendant, following final settlement approval. By contrast, in many other settlements, the recovery is capped and if class members do not file sufficient claims, a portion of the settlement fund reverts to the defendant. *See, e.g., Boeing Co. v. Van Gemert,* 444 U.S. 472, 481–82, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). Here, the full benefit of the Proposed Settlements (net of fees and expenses) will enure to class members. Moreover, the Proposed Settlements are definite and at hand.

### 4. *Degree of Opposition to the Settlement*

The small number of objections necessarily must be evaluated relative to the size of this Class of over 1.0 million members. In litigation involving a large class it would be "extremely unusual" not to encounter objections. *See In re Anthracite Coal Antitrust*

---

12. For example, Dr. Woodward concludes that the lower spreads on Instinet trades of Nasdaq securities are attributable to the fact that Nasdaq institutional trading is generally without commission, while Instinet generally adds a commission of "two to five or even six cents per share." *Id.*

at 13. Dr. Woodward likewise concludes that to the extent that stock exchange spreads appear to be lower than Nasdaq spreads for comparable securities, that difference is entirely offset by greater commissions on stock exchange trades. *Id.* at 17 and 22.

*Litigation,* 79 F.R.D. 707, 712–13 (M.D.Pa. 1978), *aff'd in part,* 612 F.2d 571 and 612 F.2d 576 (3d Cir.1979).

However, none of the thousands of institutional Class members, who have the largest financial stake, have objected to the Proposed Settlements,[13] nor have any of the class representatives objected. No objection has been filed with respect to the amount of the Proposed Settlements, and such objections as there are relate to administrative details and counsel fees.

Thus, for example, in *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118–19 (3d Cir. 1990), the Third Circuit held that the fact that "only" 29 members of a 281 member class (*i.e.,* 10% of the class) had objected "strongly favors settlement". Likewise, for example, in *Boyd v. Bechtel Corp.,* 485 F.Supp. 610, 624 (N.D.Cal.1979) the fact that only 16% of the class objected was deemed "persuasive" of the adequacy of the settlement.[14] The percentage objecting here is minuscule by comparison, requiring measurement down to thousandths of a single percent.

▪ Although each objection must be evaluated on its merits, *see Wilder v. Bernstein,* 848 F.2d 1338, 1345–50 (2d Cir.1988), the primary concern in the consideration of proposed settlements, is to compare the terms of the proposal with the likely rewards of litigation. *See Weinberger,* 698 F.2d at 73. In other words, an objection based on an assertion or argument not readily supportable at trial should not be permitted to bar settlement.

### a. *Schonbrun Objections*

▪ The only timely objections to the Proposed Settlements come from Lawrence Schonbrun, Esq. ("Schonbrun").[15] First, Schonbrun objects to "any settlement which provides for the payment to class counsel of attorneys' fees prior to class members' receipt of their allocations." In support of his contention, Schonbrun relies on *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 300 (N.D.Ca.1995) which states that, "Class counsel may withdraw *half* of the money immediately." (emphasis added).[16] Plaintiffs' assert that payment immediately after final settlement approval is the norm, rather than the exception.

Numerous courts have directed that the entire fee award be disbursed immediately upon entry of the award, or within a few days thereafter. *See, e.g., In re Wedtech Securities Litigation,* M 21–46 MDL 735 (S.D.N.Y. July 30, 1992) (attorneys' fees to be paid within three business days after the "Settlement Effective Date"); *Gaskill v. Gordon,* 942 F.Supp. 382, 388 (N.D.Ill.1996) (receiver authorized to pay attorney fees upon entry of fee award order); *In re Public Serv. Co.,* [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,988 (S.D.Cal.1992) (escrow agent ordered to disburse attorneys' fees award.

13. The only institution that has filed any objection is First Union Corporation, which has not objected to the settlement, nor to the requested fees. Its limited objection is only to Paragraph 15 of the Notice of Pendency of Class Certification and of Proposed Settlements ("Class Notice"), which requests further lists of potential Class members from, *inter alia,* banks.

14. Indeed, this Court and others have not hesitated to approve appropriate settlements even when most or all of the class representatives or plaintiffs have objected. *Maywalt v. Parker & Parsley Petroleum Company,* 864 F.Supp. 1422, 1426–33 (S.D.N.Y.1994), *aff'd,* 67 F.3d 1072 (2d Cir.1995) (settlement approved despite objections by nearly 2,700 class members, including the class representatives). *Accord, e.g., County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1325 (2d Cir.1990) (opposition by a majority of the class representatives insufficient to prevent settlement approval).

15. Schonbrun has filed his objection on behalf of two named Class members: Mr. John Kavanagh (who has documented five small trades ranging from 50 to 100 shares), and Mr. Gerald Vinnard (who has documented a single 200 share trade). He also has filed his objection on behalf of John Doe I, John Doe II, John Doe III, whose names and addresses have been withheld.

16. Where part of an award has been deferred, the preponderance is usually paid initially. *In re Prudential Securities Incorporated Limited Partnerships Litigation,* 912 F.Supp. 97, 104 (S.D.N.Y.1996) (directing an advance of 75% of the fee award to be paid within 30 days of order, the balance to be paid contemporaneously with the distribution of the class fund); *In re Asbestos School Litigation,* C.A. No. 83–0268 (E.D.Pa. Sept. 27, 1995) (15% of settlement funds to be paid to counsel initially and 10% thereafter).

upon entry of order); *Eltman v. Grandma Lee's Inc.*, [1986–87 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,798 (E.D.N.Y.1986) (approved settlement authorizing payment of attorney fees prior to fund distribution to the class). No reasoning has been advanced to justify withholding one half of the fee award at the time of settlement approval.

■ Second, Schonbrun objects to "any settlement which provides for the payment of attorneys' fees to class counsel before a final determination of . . . the Plan of Allocation," including any appeals. Schonbrun cites no authority in support of his objection. As Plaintiffs assert, his objection is directly contrary to the law in this Circuit.

■ As held by the Second Circuit in the *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 145 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988), it is appropriate, and often prudent, in massive class actions to follow a two-stage procedure, deferring the Plan of Allocation until after final settlement approval, as here:

> There is . . . no absolute requirement that [a distribution] plan be formulated prior to notification of the class. . . . The prime function of the district court in holding a hearing on the fairness of the settlement is to determine that the amount paid is commensurate with the value of the case. This can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement. The formulation of the plan in a case such as this is a difficult, time-consuming process. To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished. Moreover, if a hearing on a settlement must follow formulation of a distribution plan, then reversal of any significant aspect of the plan on appeal . . . would require a remand for reconsidera-

tion of the settlement, followed by yet another appeal. There is no sound reason to impose such procedural straitjackets upon the settlements of class actions.

818 F.2d at 170. *Accord, e.g., Manual for Complex Litigation, Third*, § 30.212 ("Often . . . the details of allocation and distribution are not established until after the settlement is approved.").

Third, Schonbrun objects to the settlement "unless class counsel submit a budget for fees and expenses of settlement administration." Again Schonbrun cites no authority for such an objection. However, given that Plaintiffs' Co–Lead Counsel already have submitted to the Court a copy of the contract with the settlement administrator setting forth detailed terms with respect to fees and expenses, this objection is moot.

Fourth, Schonbrun objects to "any settlement provision permitting future fee applications by class counsel or for the distribution of settlement funds to charitable organizations, except and unless notice is provided to all class members who have filed appearances. . . ."

The Class Notice at Paragraph 10 informed Class members that, "The Proposed Settlements contemplate that a portion of the settlement proceeds may be applied, with Court approval, to pay the reasonable cost of Class Notice and the reasonable fees and expenses of settlement administration." The Proposed Settlements contemplate that any residue remaining from uncashed checks (after any supplemental distributions, fees or expenses) may be paid to an appropriate charitable organization, subject to Court approval.

The Settlement Agreements do not preclude further notice in any of these regards. Whether the benefit of such notice would justify the cost is hypothetical and premature at this time.[17]

Fifth, Schonbrun objects to the "approval of these settlements unless class counsel file an expert's report with the Court indicating the amount of damages sustained by the class. . . ." In fact, Class Counsel has sub-

---

17. The cost of class notification to date exceeds $8 million.

mitted such an expert's report. *See* Barclay Aff.

Sixth, Schonbrun objects to the "content of the Notice because the actual amount of the fee to be sought by class counsel is not set out therein." In fact, the Class Notice, approved by this Court on February 4, 1998, expressly states at Paragraph 10 that, "Class Counsel will petition the Court for an award of attorneys' fees, not to exceed 17.5% of the Settlement Fund, and for reimbursement of litigation expenses, including the fees and expenses of experts, which Class Counsel have advanced on behalf of the Class."

Finally, Schonbrun objects that "no approximation of the amount of litigation expenses to be deducted from the class's recovery is provided in the Notice." Plaintiffs respond that this figure was calculated by Class Counsel from records from the 69 law firms which represented the Plaintiffs, some of which were received and reviewed after the Class Notice was approved and printed. These records were available for inspection and review prior to the hearing date, and no objector conducted such inspection. All Class members who contacted the Settlement Administrator with questions about the amount of the requested expenses were expressly informed of the exact amount by letter promptly after the Fee Petition was filed on June 12, 1998. *See* Radetich Aff.

In addition to his numbered objections, Schonbrun also requests appointment of a "class guardian." Plaintiffs submit that no one is better informed about this case, and better situated to serve as the "class guardian" than this Court. Indeed, the Court's familiarity with this litigation is reflected in many opinions and orders cited above.

As observed in *In re Intelligent Electronics Securities Litigation*, 1997 WL 786984 (E.D.Pa. Nov. 26, 1997), "The appointment of a class guardian would only further increase costs, extend indefinitely the time before distribution to the class and further needlessly complicate the procedures." 1997 WL 786984 at *10. Not only would such an appointment be duplicative, but it would derogate the duty of the court which is to illuminate and resolve any meritorious disputes and to insure a fair and just resolution.

Accordingly, Schonbrun's request for the appointment of a special guardian is denied.

#### b. *Other Objections*

The few remaining objections are untimely or otherwise deficient.[18] Most have been covered by Schonbrun and need not be repeated. Two objections, filed by James R. Percival ("Percival") and John Genins ("Genins"), relating to the scope of release called for by the Proposed Settlements do, however, merit discussion. Percival asserts that because the Class is limited to Class Securities:

> The claims asserted in this action are therefore limited to claims arising out of the trading of the Class Securities, and no other. Any release being given by the plaintiff Class in connection with the settlement of those claims should thus be limited to claims arising out of the trading of the *Class Securities*, and no other.

(Emphasis in original.) Similarly, Genins avers that the releases "encompass virtually all claims any class member may have against Defendants and/or any entity associated with Defendants, including their advisors."

Although Plaintiffs' consolidated complaints eventually focused on those Nasdaq securities as to which the alleged conspiracy was statistically successful (the "Class Securities"), Plaintiffs' prior and subsequent investigation was by no means limited to the Class Securities.

---

**18.** Paragraph 11 of the Class Notice expressly states that "your Notice of Intention must be accompanied with copies of account statements or other transaction records sufficient to establish your membership in the Class." Paragraph 11 also states that the "complete Notice of Intention" must be "postmarked or received not later than July 14, 1998." Finally, Paragraph 11 expressly states that, "If you do not effect your Notice of Intention in the manner and by the deadline provided herein, you will be deemed to have waived any objection."

All of the cited requirements are part of the approved notice. The Agreed Program of Class Notice was approved by the Court on February 4, 1998.

Furthermore, although the releases are not limited to the Class Securities, they are limited to Nasdaq securities, and are further limited to security transactions of the type which were subject to the complaint. The releases were the subject of extensive negotiations, because Plaintiffs' counsel insisted that they be strictly limited to the subjects at issue in this lawsuit.[19]

Indeed, over and above the strict subject matter limitations, the releases expressly carve out exceptions, so that there can be no mistake about the limited character of the releases. The exceptions include, for example, garden variety securities fraud cases, and "churning" cases. Claims of those kinds are not released even if they involve a Class Security.

Finally, the releases were not merely described in the Class Notice (as is often the custom); they were reprinted *verbatim* as Exhibit B in the Class Notice. Class members have had every reasonable opportunity to review the releases *verbatim,* and if they do not like them, to request exclusion. Persons requesting exclusion do not benefit from the settlement, but are not bound by the releases.

■ The fact that the scope of the release has been fully disclosed in the Class Notice with "opportunity for opting out" strongly supports the scope of the releases. *See, e.g., Weinberger,* 698 F.2d at 79; *O'Brien v. National Property Analysts Partners,* 739 F.Supp. 896 (S.D.N.Y.1990). As reasoned by the Honorable Peter K. Leisure in *O'Brien:*

> Notice of the release provision was provided to members of the plaintiff class, who were given the opportunity to opt out.... This option allowed those absent class members who believed that the settlement was not in their best interests to leave the class and conduct the litigation on their own.

*Id.,* 739 F.Supp. at 903–04.

■ Indeed, it is not unusual for releases in class actions to cover not only the claims

that have at one time or another actually been alleged, as here, but also "all claims that might be asserted in connection with the action." *TBK Partners, Limited v. Western Union Corp.,* 675 F.2d 456, 459 (2d Cir.1982) (affirming class action release that barred class members from pursuing appraisal proceedings in state court even if those claims could not have been asserted in the federal class action).

As summarized in the leading treatise on class actions, a "release of claims may refer to all claims raised in a pending action, or it may refer to all claims, both potential and actual, that may have been raised in the pending action...." 3 Newberg & Conte, *Newberg on Class Actions,* § 12.15 at 12–41 (3d ed.1992). *See also, e.g., South Carolina National Bank v. Stone,* 749 F.Supp. 1419, 1435 (D.S.C.1990) ("Plaintiffs and each member of the Plaintiff Class defined in this Final Judgment shall be deemed to have released ... all complaints and claims ... alleged in, or which could have been raised in, this action"); *O'Brien v. National Property Analysts Partners,* 739 F.Supp. at 899 (dismissing and barring "all claims that might have been asserted" in settled class action).

In sum, the releases are limited to Nasdaq securities, and to the sort of transactions which were the subject of the litigation. They are reasonable given the scope of the initial complaints, the multidistrict transfers, and Plaintiffs' investigation. Class members have had every opportunity to exclude themselves from the Class if they thought that the $1.027 billion settlements, including the releases, present less than a fair trade-off.[20]

For the reasons set forth above, the merits of the objections do not bar the approval of the Proposed Settlements. Accordingly, the Proposed Settlements are approved.

## II. *Attorneys' Fees and Expenses*

### A. *The Percentage Method is Appropriate*

■ Class Counsel has requested that their attorneys' fees be established based on

---

19. In other words, the Proposed Settlements do not provide the Defendants with a general release as to any securities.

20. Given the size of the class, the number of opt-outs, 3,874, is minimal.

a simple percentage of the fund established by the Proposed Settlements, rather than by the lodestar method involving attempts to evaluate specific numbers of hours spent and appropriate hourly rates. This is an issue on which there has been a great deal of writing over time, and one where the judicial tide appears to be turning in favor of the percentage method advocated by Class Counsel. An analysis of the authorities and the operation of the two methods compels adoption of the percentage method.

Counsel fees in past common fund cases were computed as a percentage of the fund, subject, of course, to considerations of reasonableness. *See e.g., Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 127–28, 5 S.Ct. 387, 28 L.Ed. 915 (1885); *Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 679, 688 (M.D.Ala.1988) (recounting the history), on the theory that the attorneys who created that fund are entitled to an award of fees and expenses from that fund. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980); *Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881). This approach allowed for the cost of litigation to be spread proportionately among each of the beneficiaries, prevented unjust enrichment by class counsel at the expense of the class, and yet provided an incentive to the bar to pursue cases where the prospect of compensation is uncertain and remote in time. It was not until the mid–1970s that the lodestar method was developed and began to spread.

In *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir.1973), a common fund case, the Third Circuit applied the method which required the court to calculate a lodestar by multiplying the number of hours reasonably devoted to the case times a reasonable hourly rate. That result was then adjusted up or down to reflect such factors as the quality of the work and the risk to counsel. Many courts embraced the new approach. *See e.g., Furtado v. Bishop,* 635 F.2d 915, 919–20 (1st

Cir.1980); *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977) (*"Grinnell II"*); *Grunin v. International House of Pancakes,* 513 F.2d 114, 128 (8th Cir.1975).

In 1984 when the Supreme Court distinguished between common fund and statutory fee cases in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891:

> Unlike the calculation of attorney's fees under the "common fund doctrine," where a reasonable fee is based on the percentage of the fund bestowed on the class, a reasonable fee under § 1988 reflects the amount of attorney time reasonably expended on the litigation.

*Id.,* at 900 n. 16, 104 S.Ct. 1541.

Since *Blum* involved the application of the lode-star under a fee-shifting statute, footnote 16 is dictum. Dictum from the High Court, however, carries great persuasive force.[21] *See Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 459 (1st Cir.1992) (stating general rule that courts should give "considerable weight" to dictum that appears "considered as opposed to casual").

Shortly thereafter, Chief Judge Aldisert, the author of the *Lindy* opinion, convened a task force that concluded that the lodestar approach should be abandoned in common fund cases. The task force found that it unnecessarily taxed the judicial system, created an illusory sense of mathematical precision leading to disparate results, was easily manipulated by judges, and created disincentives to an early settlement. *See Court Awarded Attorney Fees: Report of the Third Circuit Task Force,* 108 F.R.D. 237, 246–49 (1985).

Others have favored the percentage method because it more closely aligns the interests of the class and its counsel. *See, e.g.,* John Coffee, "Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of the Law Through Class and Derivative Actions," 86

---

**21.** It is thus not surprising that other courts have cited footnote 16 as evidence that the Blum Court's "approval of the lodestar method in the fee-shifting context was not intended to overrule prior common fund cases...." *Swedish Hospi-tal Corp. v. Shalala,* 1 F.3d 1261, 1268 (D.C.Cir. 1993); *see also Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.1988); *In re Crazy Eddie Securities Litigation,* 824 F.Supp. 320, 325 (E.D.N.Y.1993).

Colum.L.Rev. 669, 724–25 (1986) It has been stated by Professor Coffee that:

> If one wishes to economize on the judicial time that is today invested in monitoring class and derivative litigation, the highest priority should be given to those reforms that restrict collusion and are essentially self-policing. The percentage of the recovery award formula is such a "deregulatory" reform because it relies on incentives rather than costly monitoring. Ultimately, this "deregulatory" approach is the only alternative to converting the courts into the equivalent of public utility commissions that oversee the plaintiff's attorney and elaborately fix the attorney's "fair" return.

It now appears that the trend among courts is to apply the percentage approach. The D.C. Circuit and the Eleventh Circuit require use of the percentage method in common fund cases. *See Swedish Hospital*, 1 F.3d at 1271; *Camden I Condominium Ass'n v.. Dunkle*, 946 F.2d 768, 774 (11th Cir.1991).

*Swedish Hospital* contains a fulsome discussion of the general principles involved, a description of the two methods, the difference between fee shifting and common fund cases, the disincentives created by the lodestar method (delay and excessive billing), the economics of the marketplace, the difficult and complex task of reviewing the propriety of hourly billing practices and the consequent delay, and the relative objectivity of the percentage method.

Other Circuits have also approved the percentage method for determining common fund cases. *See e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*, 56 F.3d 295, 305 (1st Cir.1995); *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litigation*, 55 F.3d 768, 821–22 (3d Cir.1995) ("In common fund cases, a district judge can award attorneys' fees as a percentage of the fund recovered"; and in prior cases "fee awards have ranged from nineteen percent to forty-five percent of the settlement fund"); *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513, 515–16 (6th Cir.1993) (noting "the recent trend toward adoption of a percentage of the fund method," and permit-

ting use of the "percentage of the fund method" in common fund cases); *In re Continental Illinois Securities Litigation*, 962 F.2d 566, 572 (7th Cir.1992) (fee award should not be based on "individual hours," but rather on the percentage that counsel "would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client"); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990) ("a reasonable fee under the common fund doctrine is calculated as a percentage of the recovery"); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989) (endorsing use of percentage approach); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) ("a fee award based on a percentage of a common fund" is appropriate).

Although the Second Circuit has chosen the lodestar method in common fund cases in the past, *see In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d 226, 232 (2d Cir. 1987), there is strong support for the percentage approach from district courts in this Circuit. As the Honorable Eugene Nickerson observed in *In re Crazy Eddie Securities Litigation*, 824 F.Supp. 320, 325 (E.D.N.Y. 1993), "[s]ince at least the late 1980s the trend within this circuit has been toward the percentage-of-recovery method." *See also In re Presidential Life Sec.*, 857 F.Supp. 331, 334 (S.D.N.Y.1994) ("Problems encountered in evaluation of fees utilizing the Lodestar approach ... have led to rejection of that method in common fund cases ... and express approval of the percentage method as an acceptable alternative."); *Bragger v. Trinity Capital Enter. Corp.*, 1993 WL 287626, at *4 (S.D.N.Y. July 23, 1993) ("[t]he percentage—as opposed to the lodestar—method of determining fees in class actions is increasingly accepted as preferable in the federal courts in general, and in this District in particular."); *In re RJR Nabisco Sec. Litigation*, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,984 at 94,268 (S.D.N.Y.1992) (reiterating that "courts have tended increasingly to award fees based on a percentage of the fund" and awarding 25% of $72.5 million recovery); *In re Avon Prods., Inc. Sec. Litigation*, [1992 Transfer Binder] Fed. Sec. L.

Rep. (CCH) ¶ 97,061 at 94,701 (S.D.N.Y.1992) ("the trend in this District and elsewhere has been to award counsel fees as a percentage of the total fund"); *Bello v. Integrated Resources, Inc.,* [1990–91 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,731 (S.D.N.Y.1990) (awarding attorneys' fees equal to 30% of the recovery without computing "lodestar multiplier"); *Breiterman v. Roper Corp.,* [1989–90 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,885, at 94,832 (S.D.N.Y.1990) ("[t]his Court favors the percentage approach, and agrees with the critics of the lodestar method that lodestar awards promote inefficiency and impose unnecessary burdens on the court").

As noted by the Honorable Charles L. Brieant of this court:

> [A percentage fee] award is consistent with the new learning (old wine in a new bottle) announced by the Ninth Circuit in *Paul, Johnson,* [886 F.2d at 272], which new learning we believe will proceed from West to East and take us back to straight contingent fee awards bereft of largely judgmental and time-wasting computations of lodestars and multipliers. These latter computations, no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo. They do not guarantee a more fair result or a more expeditious disposition of litigation.

The advantages of the percentage of the fund method over the lodestar method include ease of administration, permitting the judge to focus on "a showing that the fund conferring a benefit on the class resulted from the lawyers' efforts." *Camden I,* 946 F.2d at 774, rather than collateral disputes over billing. This better respects the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

A recent rehearsal of the pros and cons of the issue comes from the West in *In re Copley Pharmaceutical, Inc.,* 1 F.Supp.2d 1407 (D.Wyo.1998), where the percentage method was adopted in a megafund case concluding that the alignment of interest of the attorneys with the interests of the parties more accurately reflected the economics of litigation practice.

The court in *Howes v. Atkins,* 668 F.Supp. 1021 (E.D.Ky.1987) noted that "[p]laintiffs' litigation practice, given the uncertainties and hazards of litigation, must necessarily be result-oriented. It matters little to the class how much the attorney spends in time or money to reach a successful result." *Id.* at 1025 (internal quotation marks omitted) and Judge Posner noted:

> The judicial task might be simplified if the judge and the lawyers spent their efforts on finding out what the market in fact pays not for the individual hours but for the ensemble of services rendered in a case of this character ... The class counsel are entitled to the fee they would have received had they handles a similar suit on a contingent fee basis, with a similar outcome.

The reasoning in *Swedish Hospital,* as described in *In re Copley Pharmaceutical,* as cited above, will be adopted here.

### B. *Fourteen Percent is an Appropriate Fee*

██ The difficulties of determining the appropriateness of attorneys' fees in common fund cases have been the subject of study and concern over time. The report of the Fee Committee of lawyers appointed by Judges Robson and Will in *In re Folding Carton Antitrust Litigation,* 84 F.R.D. 245 (N.D.Ill.E.D.1979) went back to *The Common Law* by Oliver Wendall Holmes and included all the intervening authorities. As has already been demonstrated, there are formulations and reformulations of the factors to be considered in the fixing of a particular fee in a given case. The Fifth Circuit list of twelve factors found in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974) augmented by a thirteenth, the contingent nature of the litigation, which was added by *Folding Carton* making the list of factors as complete as any.

The parameters of the percentages have been set by the custom honored contingent fee of 33⅓% and, of course, time charges expressed as a percentage in this instance approximately 3.5 percent. One issue fre-

quently confronted in fee fixing is the value of the settlement against which the percentage is to be applied. Here there is no question. The common fund is $1,027,000,000.

Class Counsel has requested a fee of 17.5 percent of the common fund which would total $179,725,000. Class Counsel maintain that the percentage requested is fair and reasonable "in light of the record-breaking result." Class Counsel further note that 17.5 percent is substantially lower than the percentage usually awarded when results are "merely good," noting correctly that a number of other courts have concluded that the benchmark for fee awards should be 25 percent.

■ While 25 percent may be the benchmark for cases involving settlements in the range of one to fifty million dollars, *see e.g., Greene v. Emersons, Ltd.,* [1987 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 93,263 (S.D.N.Y.1987) (awarding fees of one third of the $1,175,000 settlement fund); *Friedlander v. Barnes,* [1986–87 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 92,754 (S.D.N.Y.1986) (awarding attorneys' fees representing 30% of $1,025,000 settlement recovery); *Cumberland Farms, Inc. v. Browning–Ferris Indus.,* 1990 WL 69019 (E.D.Pa. May 23, 1990) (awarding fees of 25 percent of $50 million class recovery); 1 Alba Conte. *Attorney Fee Awards,* § 2.08 at 50–51 (2d ed.1993) (noting that where class recoveries have been in the $1 to 50 million range, the median fee award is 25 percent.), it is not the benchmark for megafund cases in which settlements over $100 million are achieved. Indeed, the expectation is that "absent unusual circumstances, the percentage will decrease as the size of the fund increases." *Third Circuit Report,* 108 F.R.D. at 256 and n. 63 (pointing out that *Agent Orange* plaintiffs' class counsel collected over ten million dollars in fees, yet that amounted to less than six percent of the settlement fund).

Newberg's *Attorney Fee Awards,* which analyzes the range of awards in common fund cases, emphasizes that when a common fund is extraordinarily large, as is the instant case, the application of a benchmark or standard percentage may result in a fee that is unreasonably large for the benefits conferred. *See* Herbert P. Newberg, *Attorney Fee Awards,* § 2.09. In recognition of this problem, courts reduce percentage awards as the size of the recovery increases. *See In re Prudential Ins. Co. of America Sales Practices Litig.,* 962 F.Supp. 572, 585 (D.N.J. 1997), reversed and remanded 148 F.3d 283 (3d Cir.1998) (noting that percentage awards in megafund cases range from 4.1 percent to 17.92 percent of fund); *Duhaime v. John Hancock Mut. Life Ins.,* 989 F.Supp. 375 (D.Mass.1997) (applying 9.3 percent to a common fund over $300 million).

Where the fund is unusually large, some courts have used a "sliding scale, with the percentage decreasing as the magnitude of the fund increased ..." *Manual for Complex Litigation, Third,* § 24.12 at 189, Federal Judicial Center (1995) (citations omitted). *See e.g., Branch v. FDIC,* 1998 WL 151249 (March 24, 1998) (applying 14 percent up to $22 million; 12 percent of the next $10 million, and 5 percent over and above $32 million).

This sliding scale is explained in part by economies of scale. *See Third Circuit Report,* 108 F.R.D. at 256. It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case. As noted in *In re First Fidelity Securities Litigation,* 750 F.Supp. 160 (D.N.J.1990), "[t]here is considerable merit to reducing the percentage as the size of the fund increases. In many instances the increase is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.,* at 164 n. 1. Thus where fund recoveries range from $51–$75 million, fee awards usually fall in the 13–20 percent range. *See* Newberg, at § 2.09; William J. Lynk, "The Courts and the Plaintiff's Bar: Awarding the Attorney's Fee in Class Action Litigation," 23 *J. Legal Stud.* 185, 201 (1994).

In cases where a class recovers more than $75–$200 million, courts weigh the economies of scale inherent in class actions in fixing a percentage to yield a recovery of reasonable fees. *See* Newberg, at § 2.09. Accordingly, fees in the range of 6–10 percent and even lower are common in megafund cases. *See Id.; In re Washington Public Power Supply*

*Sys. Sec. Litig.,* 779 F.Supp. 1063 (D.Ariz. 1990) (awarding fee of 4.9 percent of $690 million common fund); *In re MGM Grand Hotel Fire Litig.,* 660 F.Supp. 522 (D.Nev. 1987) (awarding 7 percent of $205 million recovery); *In re Corrugated Container Antitrust Litig.,* 1983–2 Trade Cas (CCH) ¶ 65,- 628 (S.D.Tex. September 1, 1983) (awarding fee of 9 percent of $366, million fund); *In re Folding Carton Antitrust Litig.,* 84 F.R.D. 245 (N.D.Ill.1979) (awarding fee of 6.6 percent of $200 million class settlement); *but see In re Shell Oil Refinery,* 155 F.R.D. 552, 573–74 (E.D.La.1993) (on a recovery of $170 million, the court awarded counsel fees comprising 17.92 percent of that recovery).[22]

Class Counsel on the other hand maintain that percentage fees generally are not, and should not be, inverse to the size of the recovery. Relying on the affidavits of Professors Samuel Issacharoff and Charles Silver and Professor Arthur Miller, Class Counsel assert that a downward sliding scale rewards lawyers most for the part of the work that is easiest and encourages early settlement often to the detriment of the class and propose that, "In any economic relation involving an agent, it is necessary to structure the agent's incentives to be as fully aligned as possible with the principal's. If the early dollars are the easiest to bargain for and the last dollars the hardest … the last thing a principal would give an agent is an incentive to be satisfied with the easy dollars.... A sensible principal would do the reverse." Declaration of Professors Issacharoff and Silver at ¶¶ 42–43.

As explained by the Honorable Abraham D. Sofaer, fee awards that encourage better recoveries are ultimately in the "best interests" of current and future class members:

> It unquestionably is true that without able lawyers handling these matters not only do some of them go unprosecuted, but the big difference in my experience is in the amount obtained and you don't get the highest recovery and when you are paying at the low end of the scale of fee recovery in contingent actions, it seems to me that I as the protector of the class, can fairly say,

and honestly say, that I believe it is in the class' best interests—of this class and of future classes yet unknown—to pay this kind of money for these kinds of benefits.

*In re Pepsico Securities Litigation,* Civil Action No. 82–Civ–8403 (S.D.N.Y. April 26, 1985) Transcript of April 26, 1985 at 17–18, as quoted with approval in *In re M.D.C. Holdings Securities Litigation,* [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,474 at 97,492 (S.D.Cal.1990). Flat percentage awards in megafund cases do create the proper incentives for class counsel and serve to maximize potential benefits to be conferred on the class while protecting against windfalls to class counsel.

A review of the megafund cases cited above center on percentage ranges from 6–10 percent, but this range must be evaluated against the particulars of this settlement.

"[I]ndividualization in the exercise of discretionary power [for fee awards] will alone retain equity as a living system and save it from sterility." *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 167, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

■ Certain factors are particularly relevant in in evaluating attorney's fee awards: (1) the amount of work done; (2) the risk incurred; (3) the difficulty or complexity of the case; (4) the benefit to the class, and (5) the benefit to the public. *See Cranston v. Hardin,* 504 F.2d 566, 578 (2d Cir.1974) *Grinnell I,* 495 F.2d at 470; *In re Warner,* 618 F.Supp. at 746–47.

The quality of Class Counsel's representation and the benefit to the Class of the sizeable recovery achieved are not questioned. The recovery in this case is exemplary. The instant settlement is nearly 130 times larger than the average class action settlement between 1991 and 1994, *see* Coffee Aff. ¶ 19, and the largest ever in an antitrust class action. In addition to the considerable benefit conferred upon the class members, there is also an appreciable benefit to the public in this case. Meritorious class actions, such as the present action, promote private enforcement of, and compliance with, the an-

---

**22.** Although the court in *Shell Oil* checked its analysis against the percentage method, it pri-

marily relied upon the lodestar method. It applied a multiplier of 3.25. 155 F.R.D. at 574.

titrust laws. Indeed, Class Counsel report that spreads are now 41 percent lower than they were at the start of this action.

The role of Class Counsel was critical, not only in achieving the significant recovery, but in framing the issues which became the subject of the later served civil investigative demands of the Antitrust Division of the Department of Justice. This class action litigation was the foundation stone for the consent decree which ended the practices complained of.

Moreover, this record-breaking result was achieved against formidable opposition. Indeed, Defendants were represented by several dozen of the nation's biggest and most highly regarded defense law firms. The quality of opposing counsel is also significant in considering the quality of services rendered by plaintiffs' counsel, as measured by the result achieved. *See, e.g., In re Warner Communications,* 618 F.Supp. at 749 ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work"). The ability of Class Counsel to obtain record-breaking settlements in the face of a stubborn and well executed defense further evidences the excellent quality of petitioners' work.

██ As already noted, this litigation involved substantial risks. From the inception of the action, there existed a significant possibility that Class Counsel would achieve no recovery, and thus no compensation. Risk, of course, must be judged as it appeared to counsel at the outset of the case, when they committed their capital (human and otherwise). *See, e.g., Harman v. Lyphomed, Inc.,* 945 F.2d 969, 976 (7th Cir.1991). Although the final stages of this case involved transforming a coupon settlement into an even larger all-cash settlement, and settling with the one final holdout, it is essential to recall the situation in 1994, when defense counsel, journalists, and some world renowned economists all expressed skepticism on the merits of the claim, as well as the feasibility of a class action encompassing 1,659 different se-

curities, and more than a million class members.

In order to achieve this $1.027 billion settlement, Class Counsel had to, and ultimately did, overcome risks in at least four important areas by: surmounting Defendants' motion to dismiss; certifying a broad (1,659 security) class; developing credible classwide evidence of liability; and developing credible evidence of damages.[23] *See* Barclay Aff. Furthermore, the risks in each of the crucial five areas were independent of one another. There would have been no recovery if Plaintiffs had failed in any of these five areas. Viewed from the outset, the probability of succeeding in all five necessary areas, and thereby achieving a billion dollar all-cash settlement, was far from foregone.

Considering some of the Fifth Circuit factors listed in *Johnson,* there was a great deal of time and labor involved given the demands of discovery and the resolution of the issues referred to above. Certainly the issues were novel and difficult requiring a challenge to a long-standing industry practice and the exercise of skill and imagination. The achievement of certainty in the result is an extremely significant accomplishment given the uncertainties of multidistrict litigation resulting from *Lexecon.* Finally, to achieve certainty now, as opposed to five years from now, is also highly significant.

While a reduction from the top of the percentage range of megafund fee awards and the requested 17.5 percent is appropriate, the balancing of all the factors referred to above require a substantial and noteworthy percentage in the upper range of fees awarded in such cases. That percent is fourteen percent, a reduction of approximately twenty percent from the requested percentage and a percentage which will generate fees in the amount of $143,780,000.

## C. *A Fourteen Percent Fee is Consistent with the Lodestar Analysis*

██ It is appropriate to check the fee achieved by the percentage method against a

---

**23.** Notably, this is not a case where "plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made

the kill." *In re Gulf Oil/Cities Service Tender Offer Litigation,* 142 F.R.D. 588 (S.D.N.Y.1992). In this case, plaintiffs' class action preceded any action by the government.

lodestar analysis.[24] Under the lodestar method, the "lodestar" is calculated by multiplying the number of hours reasonably expended by the prevailing rates for the services provided, the rate "normally charged for similar work by attorneys of like skill in the area," taking into account factors such as the experience of the attorney performing the work and the type of work performed. *Grinnell II*, 560 F.2d at 1098.

Once the lodestar is calculated, an enhancement or decrease should be determined, *see Grinnell I*, 495 F.2d at 471, considering such factors as contingent risk, quality of representation, and results achieved. *See e.g., In re Agent Orange*, 818 F.2d at 234–35. In adjusting the lodestar, the Second Circuit and courts in this District also have taken into account the social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation. *See, e.g., Alpine Pharmacy v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir.1973); *In re Warner*, 618 F.Supp. at 750–51.

Class Counsel aver that their rates are their current, non-contingent hourly rates charged in antitrust and other complex litigation, ranging from approximately $165 an hour to $475[25] for non-contingent cases in which fees are paid currently and without risk. *See, e.g., Roberts v. Texaco Inc.*, 979 F.Supp. 185, 194 fn. 13 (S.D.N.Y.1997).

These rates necessarily reflect the reputation, experience, and successful records of petitioning counsel and their firms. *See, e.g., In re Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297, 355 (N.D.Ga. 1993) (approving hourly rates of up to $500 per hour for partners in lodestar calculations).

The 117,199.9 hours of attorney time and 12,428.8 hours of paralegal time invested by the 69 petitioning law firms are reasonable given the magnitude of the litigation as well as magnitude of the defense, which included three dozen of the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years.[26]

The percentage fee award in this case represents a multiplier of approximately 3.97 times Class Counsel's lodestar of $36,191,751. A multiplier of 3.97 is not unreasonable in this type of case. Indeed, as noted by the Honorable Leonard B. Sand, "In recent years multipliers of between 3 and 4.5 have become common." *Rabin v. Concord Assets Group, Inc.*, [1991–92 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,471 (S.D.N.Y.1991) (applying a 4.4 multiplier), *quoting O'Brien v. National Property Analysts*, 88 Civ. 4153, Tr. p. 72 (S.D.N.Y. July 27, 1989). The fee award is well supported by precedent within this Circuit. *See e.g., Roberts v. Texaco*, 979 F.Supp. 185 (1997) (5.5 multiplier); *In re RJR Nabisco, Inc. Securities Litigation*, [1992 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,984 (S.D.N.Y.1992) (awarding a percentage-based fee representing 6 times lodestar).

### D. *Expenses*

■■■ Class Counsel requests reimbursement for expenses totaling $4,413,485.18. Class Counsel has provided adequate accountings of litigation expenses which tie the purported expenses to a specified legal product. *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1269 (2d Cir.1987) ("reducing award for expenses by 25% where records were inadequate to permit a determination of the nature or timing of the activities that required most individual expenditures."); *Carrero v. New York City*

---

**24.** Some courts have found it useful to use the lodestar method to "double check" a fee based on the percentage method. *See e.g., In re General Motors Corp.*, 55 F.3d at 821. ("For example, a court can use the lodestar method to confirm that a percentage of recovery amount does not award counsel an exorbitant hourly rate ...").

**25.** The Supreme Court has held that the use of current rates is proper since such rates more adequately compensate for inflation and loss of

use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 284, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). *See also, e.g., In re Union Carbide Corp. Consumer Products Business Sec. Litig.*, 724 F.Supp. 160, 163–64 (S.D.N.Y.1989) and authorities cited therein.

**26.** Counsel have excluded from their lodestar all of the time expended with regard to the fee petition.

*Hous. Auth.,* 685 F.Supp. 904, 909–10 (S.D.N.Y.1988) (disallowing fees for inadequate documentation of expenses), *modified on other grounds,* 890 F.2d 569 (2d Cir.1989). Class Counsel is therefore entitled to full reimbursement for their expense claims.

## III. *Genins' Motion to Intervene and Become an Additional Class Representative Will Be Denied*

■ Genins has moved to intervene and to become an additional class representative. Genins has indicated that he intends to use this class action as a vehicle to obtain payment for his unrelated, individual claims against Merrill Lynch, Dean Witter and/or Bear Stearns:

> Wherefore, the undersigned prays that ... in the event that the Court does approve the settlement and enter Judgment thereon ... and if the Judgment is affirmed allow him to intervene and litigate herein his claims against Dean Witter and Merrill Lynch....

Genins' Addendum To Objection at 5.[27]

■ Indeed, Genins' Addendum to Objection acknowledges at n. 8 that, "[i]ntervention does not permit the creation of a whole new lawsuit by an intervenor," citing *Washington Elec. Coop. v. Massachusetts Mun. Wholesale Elec. Co.,* 922 F.2d 92, 97 (2d Cir.1990). Yet, that is what Genins is attempting with regard to his unique individual claims.

■ There are two competing policies underlying intervention: *"efficiently* administrating legal disputes by resolving all *related* issues in one lawsuit" and "keeping a single lawsuit from becoming unnecessarily complex, unwieldy or prolonged." *United States v. Pitney Bowes, Inc.,* 25 F.3d 66, 69 (2d Cir.1994). Genins' intervention would defeat both policies.

Federal Rule of Civil Procedure 24(a)(2) permits intervention as of right only with a timely application and

when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2); *see also United States v. Pitney Bowes, Inc.,* 25 F.3d at 70; *Washington Elec. Coop. Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 922 F.2d 92, 96 (2d Cir.1990).

■ Intervention will be denied unless all four requirements—timeliness, an interest relating to the subject of the action, impairment of the intervenor's ability to protect his interest, and inadequate representation of the intervenor's interest by existing parties—are met. *Pitney Bowes,* 25 F.3d at 70.

■ Moreover, it is the putative intervenor's burden to show a right to intervene. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 149 F.R.D. 55, 58 (S.D.N.Y.1993).

Genins' September 8, 1998 motion to intervene was filed at the time of the settlement objections hearing, almost two months after the July 14, 1998 deadline for objecting to the class settlement, and 25 years after his purported claim against Merrill Lynch arose.

The Second Circuit has noted on several occasions that "jeopardizing a settlement agreement causes prejudice to the existing parties to a lawsuit." *Pitney Bowes,* 25 F.3d at 72; *New York News, Inc. v. Kheel,* 972 F.2d 482, 487 (2d Cir.1992) (describing situation where parties had agreed to settle and intervention would revive disputes); *Farmland Dairies v. Commissioner of New York State Dep't of Agric. & Mkts.,* 847 F.2d 1038, 1044 (2d Cir.1988) (listing as one interest substantially prejudiced by intervention the "interest in avoiding continuing litigation"). Interjecting any new issues at this juncture,

27. Plaintiffs' Co–Lead Counsel, Christopher Lovell, Esq. ("Lovell") avers that Genins told him during a phone conversation that his claim against Merrill Lynch had gone nowhere for the past 20 years and that he intends to use this litigation as a vehicles to recover on those claims. Lovell Aff. ¶ 3(a) and (d). Further Lovell avers that Genins suggested that "anyone" (including Plaintiffs) could make Genins an offer to settle his personal claims. Lovell Aff. ¶¶ 3(g) ("make me an offer") and 4 ("it doesn't have to be defendants who pay me, anyone can").

following the negotiation of settlements, would be unsettling and untimely.[28]

Potential intervenors like Genins must "take the pleadings in a case as they find them"; they may not by intervention "radically alter th[e] scope to create a much different suit," or "inject collateral issues into an existing action." *Washington Elec.*, 922 F.2d at 97; *see New York News, Inc. v. Kheel,* 972 F.2d at 486. The intervention rule is not intended to create whole new suits. *See Washington Elec.*, 922 F.2d at 97.

Here, Genins' apparent intent is to use this class action as a vehicle to litigate his unrelated, 25 year old claims. His claims do not allege spread-fixing, and arose long before the class period began. Such remoteness of subject matter precludes his intervention here.

■ Class members need not formally intervene in order to raise their objections to a proposed settlement. *See 3 Newberg on Class Actions* § 16.10 at 16–61 to –62 (3d ed.1992); *see, e.g., Presidential Life Ins. Co. v. Milken,* 946 F.Supp. 267, 272 (S.D.N.Y. 1996). Here, all class members, including Genins, were given notice of the proposed settlement, instructions on how to object, and a deadline by which they must object or opt-out.

■ Presumptively, Class members are adequately represented by the existing Class representatives. *See Arney v. Finney,* 967 F.2d 418, 421 (10th Cir.1992); *see also Washington Elec.,* 922 F.2d at 98 ("[A] putative intervenor's interest is not inadequately represented merely because its motive to litigate is different from that of a party to the action.") Genins' only evidence of inadequate representation is that class counsel negotiated a settlement of which he does not approve. This difference of opinion can be adequately addressed through this Court's consideration of the fairness of and timely objections to the settlement. Intervention as of right is unnecessary and unwarranted.

■ Because Rule 23 grants no absolute right for class members to intervene, a puta-tive intervenor must satisfy the requirements of Fed.R.Civ.P. 24 before he is permitted to intervene. *See 3 Herbert Newberg & Alba Conte, Newberg on Class Actions* § 16.06 at 16–35 (3d ed. 1992 & 1998 Supp.); *see, e.g., Diduck v. Kaszycki & Sons Contractors, Inc.,* 149 F.R.D. at 58–59.

The motion for intervention must be timely and the court must consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b)(2). *See Comer v. Cisneros,* 37 F.3d 775, 801 (2d Cir.1994).

■ Other relevant factors "include the nature and extent of the intervenors' interests, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *H.L. Hayden Co. of New York v. Siemens Medical Sys., Inc.,* 797 F.2d at 89 (citation omitted).

Even if there were sufficient common questions, Genins' claims are at odds with the Class, because his desire to litigate and recover on unrelated claims herein would potentially dilute other Class members' recoveries, ignite controversy about the merits and value of his claims, and delay disbursement of the settlement proceeds. *Cf. New York News, Inc. v. Kheel,* 972 F.2d at 487 (describing, *inter alia,* parties' interest in avoiding continuing litigation); *see also Presidential Life Ins. Co. v. Milken,* 946 F.Supp. at 277 (settling defendants and plaintiff class would be "severely prejudiced" by delay of distribution of settlement proceeds).

■ Genins also seeks to become an additional class representative. In his Addendum to Objection he states:

This Action should proceed with a class representative able to recover a Judgment sufficient to compensate the class members, to adequately punish and deter defendants for and from their thievery; and who will obtain a settlement that does not

---

**28.** By contrast, Genins will not be prejudiced by denial of his motion to intervene. He will be free to continue to prosecute his alleged $11 million claim in Georgia.

punish the class members who may have other claims against defendants.

Wherefore, the undersigned prays that the Court shall reject the Settlement Agreement, allow him to intervene to contest same ... and allow his appeal [of the settlement if the Court approves it], and ... to intervene and litigate herein his claims against Dean Witter and Merrill Lynch (as they are designated as defendants and the recipients of the releases allowed by the settlement).

Genins' Addendum to Objection at 5 (footnote omitted).

Aside from the fact that Genins has not established the need for an additional representative at this stage of the litigation, Genins' request to be made a class representative is inappropriate in light of his unique unrelated claims.

 As this Court has held, proposed representatives must show, *inter alia*, that their interests do not conflict with the interests of other class members. *In re NASDAQ Market–Makers Antitrust Litigation,* 172 F.R.D. 119, 127 (S.D.N.Y.1997) (citing *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 & n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) and *Ross v. A.H. Robins Co.,* 100 F.R.D. 5, 7 (S.D.N.Y.1982)). *See also, e.g., In re NASDAQ Market–Makers Antitrust Litigation,* 169 F.R.D. 493, 512–13 (S.D.N.Y.1996). Genins' interest in litigating his unique claims in this case directly conflicts with the interest of other class members in finality, non-dilution and prompt payout.

### Conclusion

For the reasons set forth above, the motion to approve the Proposed Settlements is granted. Class Counsel will be awarded fees of 14.0 percent of the common fund plus full reimbursement for expenses. Genins' motion will be denied.

It is so ordered.