LONG v. ABBOTT LABORATORIES, 1999 NCBC 10

| | |
|---|---|
| **STATE OF NORTH CAROLINA** | **IN THE GENERAL COURT OF JUSTICE** |
| **COUNTY OF MECKLENBURG** | **SUPERIOR COURT DIVISION** |
| | **97-CVS-8289** |

**STACY LEE LONG, on Behalf of Himself and all Other Similarly**

**Situated Individuals,**

          **Plaintiff,**

vs.

**ABBOTT LABORATORIES; AMERICAN HOME PRODUCTS CORPORATION; BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.; BRISTOL-MYERS SQUIBB COMPANY; BURROUGHS-WELLCOME CO. ; KNOLL PHARMACEUTICAL COMPANY; ELI LILLY AND COMPANY; FOREST LABORATORIES, INC.; GLAXO, INC.; HOFFMANN-LAROCHE, INC.; JOHNSON & JOHNSON PHARMACEUTICAL TRADING CO., INC.; MERCK & CO., INC.; MARION MERRELL DOW, INC.; PFIZER, INC.; NOVARTIS PHARMACEUTICALS CORPORATION; THE PERDUE FREDERICK COMPANY; RHONE-POULENC RORER PHARMACEUTICAL INC.; SCHERING CORPORATION; SCHERING-PLOUGH CORPORATION; G.D. SEARLE & CO.; SMITHKLINE BEECHAM PHARMACEUTICALS CO.; THE UPJOHN COMPANY; WARNER-LAMBERT COMPANY; and ZENECA, INC.,**

          **Defendants.**

**ORDER ON PETITION FOR ATTORNEY FEES**

{1} This matter is before the Court on class counsel's petition for attorney fees. For the reasons set forth below, class counsel are awarded, in the Court's discretion, fees and expenses totaling $961,117.92.

I.

## A.

{2} This class action is one of eleven separate class actions filed in eleven separate jurisdictions. The actions are listed on Appendix A attached hereto and will hereinafter be referred to as the "Actions," or "Action" when referring to an individual case. The Actions were virtually identical and prosecuted on a coordinated basis. (Affidavit of Bernard Persky Applicable to Indirect Purchaser Actions, para. 1, hereinafter "Persky Affidavit.") The class representatives in each Action sought to represent the same class: consumers in each jurisdiction who purchased (indirectly from defendants) brand name drugs at retail drugstores.

{3} Each separate class action is based upon the same allegations: that the defendants violated either antitrust laws, consumer protection laws or both in each jurisdiction by selling brand name drugs to health maintenance organizations (HMOs) and mail order pharmacies at a discount to the price at which the same drugs were sold to retail pharmacies (the "two tiered pricing system"). The defenses in each jurisdiction were the same. First, defendants asserted that the class representatives lacked standing to bring the Actions since they were indirect purchasers. Second, defendants asserted that no conspiracy to fix prices existed and that their two tiered pricing system was justified by market conditions based on the differing leverage asserted in the purchasing process by their respective kinds of customers. HMOs could control what prescriptions were written, while retail pharmacists only filled the prescriptions brought to them. HMOs had leverage because of their power to control the prescription process. That leverage had expanded as HMOs and mail order pharmacies grew in size and control of the health services market. The two tiered pricing system has been in effect for many years.

{4} Since each Action sought class treatment, class certification issues existed in all cases.

{5} The Actions were not the first claims asserted against these defendants for violation of the antitrust laws arising out of the two tiered pricing system. Prior to any of the Actions being filed, retail pharmacies and other direct purchasers from the defendants filed many cases in various federal courts alleging that the two tiered pricing system violated the Sherman Anti-Trust Act. 15 U.S.C. § 1 (1994). No similar cases were brought on behalf of indirect purchasers because the federal courts do not recognize indirect purchaser standing to assert violations of federal antitrust laws. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 52 L. Ed. 2d 707 (1977). Under federal case law, only the direct purchaser (the retail drug store in this case) could recover for alleged violations, and defendants could not plead that the increased costs were passed through to another level in the distribution chain. *Hanover Shoe, Inc. v . United Shoe Machinery Corp.*, 392 U.S. 481, 20 L. Ed. 2d 1231 (1968). The federal cases were consolidated by the Judicial Panel for Multidistrict Litigation and assigned to one judge, the Honorable Charles P. Kocoras, for management (the "MDL Litigation"). *See In re Brand Name Prescription Drug Antitrust Litigation*, No. 94 C 897, MDL No. 997, 1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994). Part of the litigation before Judge Kocoras included a class action brought on behalf of indirect purchasers in Alabama. Judge Kocoras refused to certify the Alabama Action as a class action, citing the complications arising from tracing the "pass on" of overcharges to customers through the various levels of the chain of distribution. *Id.* at *19. Judge Kocoras did certify a class of retailers who were direct purchasers.

{6} Thus, at the end of 1994, a retailer class action was proceeding in federal court, and in the only state-based indirect purchaser case, the court had declined to certify a class.

## B.

{7} Beginning in January 1995, class counsel filed "the first wave of coordinated indirect purchaser actions." (Persky Aff. para. 12.) In this context, "class counsel" consisted of six law firms that affiliated for the purpose of pursuing indirect purchaser cases against the defendants. (Persky Aff. para. 8.) Where necessary, the six firms then associated local counsel in each jurisdiction. Appendix C attached hereto details the law firms involved, whether they were class counsel or local counsel, and the time devoted by each to the coordinated effort in all jurisdictions. As Mr. Persky stated in his affidavit: "This coordination of effort, in practice, was intended to, and did, work in much the same manner as in federal actions coordinated by orders of the Judicial Panel on Multidistrict Litigation, with the informal appointment of 'lead counsel' and division of duties, responsibilities and expenses among the counsel involved." (Persky Aff. para. 1.) Unlike federal multidistrict litigation, no state court had jurisdiction to order anything done in any other jurisdiction, and, unlike federal

multidistrict litigation, the process of determining lead counsel and allocation of responsibilities and expenses was by self-selection of class counsel, not by order of any court. In addition, unlike most federal multidistrict antitrust cases, the legal basis of each state action was different.

{8} Actions were filed in those jurisdictions in which indirect purchasers had been granted standing by statute or case law and those jurisdictions where it was unclear whether indirect purchasers had standing to sue for violations of state antitrust laws. Thus, Actions were initially filed in eight states and the District of Columbia. North Carolina was not in the first wave.

{9} The "second wave" consisted of Actions in Kansas (1996), Tennessee (1997) and Florida (1997). (Persky Aff. para. 40.) These Actions became mired in a procedural battle over whether they would be tried as part of the federal multidistrict litigation or as individual state cases. The cases were removed to federal court, consolidated with the multidistrict litigation, appealed to the Seventh Circuit Court of Appeals, remanded to the federal district court and subsequently back to the respective state courts. The protracted procedural battles over jurisdiction in the second wave cases had already ended when this settlement was reached.

{10} Last, but not least, was the North Carolina Action. It was filed in 1997 after the 1996 decision of the North Carolina Court of Appeals in *Hyde v. Abbott Labs,* 123 N.C. App. 572, 473 S.E.2d 680 (1996). That decision was the first in North Carolina to hold that indirect purchasers can have standing under the North Carolina antitrust laws. The class certification and standing issues were never ruled upon in this North Carolina Action. [fn1]

{11} The status of the Actions at the time of settlement is set forth in Appendix A attached hereto. As that chart and Mr. Persky's affidavit (paras. 57-61) make clear, when settlement discussions finally reached a serious stage, class counsel had been largely unsuccessful in winning both standing and certification challenges. Class counsel had prevailed on both issues in the District of Columbia (the least populous jurisdiction), but had lost certification battles in New York (the most populous jurisdiction) and several other large states. (*See* Appendix A.) Standing and certification loomed as big hurdles for class counsel, particularly if they were to conduct the litigation as one class action as opposed to eleven separate actions.

C.

{12} However, standing and certification issues were not the only hurdles facing class counsel. Even if they prevailed on standing and certification, they still had to prove a very difficult case on the merits. In fact, class counsel for the retailers failed to establish the very conspiracy that was at the heart of the Actions being pursued on behalf of the indirect purchasers. The retailer class action has been tried, and Judge Kocoras dismissed the plaintiffs' case at the close of the plaintiffs' evidence (which lasted ten weeks), finding that there was insufficient proof of conspiracy to get beyond the motion for a directed verdict. *In Re Brand Name Prescription Drug Antitrust Litigation*, No. 94 C 897, MDL No. 997, 1999-1 Trade Cas. (CCH) P84,118 (N.D. Ill. Jan. 19, 1999), 1999 U.S. Dist. LEXIS 550, 1999 WL 33889 (Kocoras, J.). Fortunately for class counsel, but perhaps not coincidentally, they had reached a settlement agreement with most of the defendants just a few months before the retailer class action went to trial.

{13} *In summary, at the time of settlement, class counsel had experienced little success in establishing both standing and class certification in other jurisdictions and faced opposition on both issues in North Carolina. Even if they prevailed on the procedural issues they still faced a high risk of loss on the merits. The North Carolina Action was settled before any of the issues posing a high risk were heard.*

D.

{14} This settlement encompasses all eleven Actions and resolves the claims against defendants representing 98.94 percent of the market. Only Forest Laboratories, Inc. and The Purdue Frederick Company declined to participate. The settlement fund totaled $64,311,000. North Carolina's share was $8,904,600 before notice costs and administrative expenses. Rather than being divided among the class members, the fund is being distributed to a national organization for use by North Carolina Community Health Centers, which provide medical care in under-served communities. The vast majority of settlement class members in North Carolina

will not see a penny from this settlement. This Court has no quarrel with the way the settlement fund was divided among the Actions. There was no single right way to divide the fund given the various stages of litigation in different jurisdictions and the differing laws of each state. Nor does the Court quarrel with the *cy-pres* distribution of the funds. It is apparent that just the cost of administration of distribution of the fund to the full range of actual class members in North Carolina would have far exceeded the resources of the fund and that the amount to be distributed would have been so paltry that few class members would have even bothered to file a claim if given the opportunity. *For all practical purposes, this was a cost of litigation settlement for such a small sum of money per class member that administration of the settlement fund could only be accomplished by means of a cy-pres distribution.*

{15} In the North Carolina Action, the settlement represents a $1.23 benefit per person after deductions for notice and administrative fees, but before deductions for attorney fees and expenses. With the award made by this order, the North Carolina common fund drops well below eight million dollars. When $1.23 is divided by the number of years in the class period (approximately 4.8), the recovery becomes approximately 26 cents per person for each year claimed. *See* Persky Aff. para 70.

{16} There can be little doubt that this is a cost of litigation settlement. There are twenty-three settling defendants. Each had expenses associated with defending class actions in eleven jurisdictions, including the cost of national and local counsel. The allegations covered over <u>eight hundred</u> brand name drugs. Each defendant would also incur internal costs for its in-house counsel and business associates. These costs would have increased had these Actions gone forward. The cost of all the trials, if eleven occurred, would have been tremendous. The cost of one trial might well have been high enough to justify this settlement. (The simpler retailer case took ten weeks for the plaintiffs' evidence alone!) If each defendant has incurred costs similar to those being experienced by class counsel (class counsel's lodestar figure was $6,532,537.75), and that figure is multiplied by 25, the cost already associated with defending these Actions to date could be over 160 million dollars. Even if each defendant has only incurred half of class counsel's time and expense, the cost of defense prior to settlement exceeds the amount of the settlement. Moreover, most of the cases were still in the early procedural stages. There is no question that the total cost to defendants of litigating these Actions through the balance of the procedural issues and trial would have been far in excess of the settlement. *This was expensive litigation that consumed tens of millions of dollars in fees and expenses.*

{17} The settlement must also be valued against the potential recovery. In the North Carolina Action, class counsel indicated that the potential base recovery for compensatory damages was 19.3 million dollars a year. The class period alleged covered 4.8 years. Therefore, the potential recovery for North Carolina class members, including treble damages and excluding attorney fees, would have exceeded 277 million dollars. Defendants paid roughly 9 million dollars (or about three cents on the dollar) for their peace and a release. *See* Appendix B. Considering the potential costs of litigation and potential liabilities eliminated, this was a good bargain for defendants.

{18} Thus, defendants had a strong financial incentive to settle. However, a cost-effective settlement was not the only motivation for defendants to settle. Not only did the defendants escape further cost, they obtained a full and complete release and an agreement that no class member could sue them for continuing the pricing policies which were the subject of the Actions. *See* the Agreement of Settlement and Release of April 24, 1998 (hereinafter "Settlement Agreement") para. 15. They obtained assurance that no class member could challenge their historic pricing methodology in the future. *No defendant has made, was required to make or will in the future be required to make any change in any business practices that would arguably benefit the class.*

{19} Other courts seem to have focused on the total dollar amount of the settlement, not the overall "success" of class counsel. In every other Action, class counsel have been awarded a 25 percent contingency fee for obtaining this settlement, or approximately fourteen million dollars ($14,000,000) in total. Since this Court will depart from the approach taken by the other courts in which Actions were pending, a detailed explanation of this Court's decision is in order.

II.

{20} Even though most class members will receive no benefit from this settlement, a fund has been created which constitutes a "common fund" under North Carolina law. *Horner ex rel. City of Burlington v. Chamber of Commerce of the City of Burlington, Inc.*, 236 N.C. 96, 72 S.E.2d 21 (1952). The fact that the fund calls for a *cy-pres* distribution does not prevent classifying the settlement fund as a common fund for the purposes of deciding if attorney fees may be awarded and, if so, how much. The use of *cy-pres* distributions should not be discouraged. Often they provide the only feasible means of reaching a settlement, as was the situation in this case. Thus, although the settlement does not provide a benefit for every member of the class which can be determined with mathematical certainty as specified in *Bailey v. State of N.C.*, 348 N.C. 130, 500 S.E.2d 54 (1998), the use of the *cy-pres* distribution compensates for that deficiency. In *Horner*, the Supreme Court held that attorney fees could be allowed in cases which result in the preservation, protection or increase of a common fund.

> [T]he rule is well established that a court of equity, or a court in the exercise of equitable jurisdiction, may in its discretion, and without statutory authorization, order an allowance for attorney fees to a litigant who at his own expense has maintained a successful suit for the preservation, protection, or increase of a common fund or of common property, or who has created at his own expense or brought into a court a fund which others may share with him.

*Horner,* 236 N.C. at 97-98, 72 S.E.2d at 22.

## III.

{21} This Court has concluded on previous occasions that the determination of attorney fees in common fund cases involves issues of equity and requires the application of equitable principles. *In re Senergy & Thoro Class Action Settlement,* 1999 NCBC 7, paras. 18-19, (No. 96 CVS 5900, New Hanover County Super. Ct. July 14, 1999) (Tennille, J.). The North Carolina Supreme Court has directed trial courts to exercise their discretion in awarding fees from common funds with "jealous caution, lest the administration of justice be brought into disrepute." *Horner*, 236 N.C. at 101, 72 S.E.2d at 24. In making its fee determination, the Court must protect the public interest, the interests of the absent class members and the interests of class counsel.

{22} In common fund cases, the North Carolina trial courts have routinely adopted a multiple factor or hybrid approach to determining attorney fees which uses both the percentage of the fund method and the lodestar method in combination with a careful consideration of the fee factors set forth in the Rules of Professional Conduct of the North Carolina State Bar. This approach is also supported by the Attorney General of North Carolina. [fn2]

{23} North Carolina does not impose mechanical guidelines in applying equitable principles to these determinations. Trial courts should also correlate the attorneys' compensation with the structure of the settlement benefits the attorneys negotiated for the class. *See In re Senergy,* 1999 NCBC 7*; Goodrich v. E.F. Hutton Group, Inc.,* 681 A.2d 1039 (1996). This Court will apply the multiple factor approach in this case as it endeavors to correlate the attorneys' compensation to the structure of the benefits the attorneys negotiated for the class.

## IV.

### A.

{24} <u>Benefit to the Class.</u> Any assessment of the relevant factors begins with an analysis of the benefit created for the class by the efforts of class counsel. In this case, the class representative, Stacy Lee Long, did not ask for and did not receive any benefit from the settlement. The vast majority of absent class members will not receive any benefit from the settlement. The settlement class consisted of:

All persons who, at any time during the period commencing June 27, 1993 through April 24, 1998, purchased or obtained brand name prescription drugs from any retail drug store or pharmacy in the State of North Carolina (excluding purchases paid for or reimbursed by Medicaid), which were manufactured, marketed, distributed or sold (directly or indirectly) by any defendant, for consumption by themselves and/or their families and not for resale.

(Settlement Agreement para. 1.)

{25} The only class members who will receive a benefit are class members who qualify for assistance at North Carolina community health centers. There is no evidence in the record that any significant percentage of the absent class members will participate in the programs of the community health centers. No policy or practice of the defendants was changed in any way that benefited the class. To the contrary, defendants got a retroactive and prospective release.

{26} The amount of the settlement per person was so small that if this were not presented as a *cy-pres* settlement, it is doubtful that the court would approve a class certification for such a small amount of money per beneficiary. *See, e.g., Maffei v. Alert Cable T.V. of N.C.* , 316 N.C. 615, 342 S.E.2d 867 (1986). The recovery for North Carolina residents was $1.23 per person (26 cents per year), after the costs of notice and administration expenses, but <u>before</u> attorney fees and expenses are deducted.

{27} Further, the amount of the settlement (less than 8 million dollars net of expenses) was unimpressive compared with the potential recovery of 277 million dollars. (Appendix B.) This was a cost of litigation result that was outstanding only in the sense that class counsel were able to create such an expensive problem that they were able to get an expensive cost of litigation settlement. According to Mr. Persky's affidavit, the value of the settlement was declining as class certification contests were lost in the bigger states. *See* Persky Aff. paras. 59-62.

{28} Class counsel did not accomplish anything of significance for the class in this litigation. In other cases, this court has recognized the efforts of class counsel when they have overcome difficult odds to achieve an unexpected result for class members. *See* this Court's fee award in *Byers v. Carpenter,* No. 94 CVS 04489 (Wake Co. Sup. Ct. (1998)) (Tennille, J.) (where class counsel turned the proverbial sow's ear into a silk purse). In this case, what was a sow's ear at the outset remained mammalian in composition through settlement.

{29} In summary, the net settlement figure of under 8 million dollars for the North Carolina Action was a relatively poor result for the majority of North Carolina class members, but one which probably accurately reflected (1) the merits of the case and (2) North Carolina's share of the enormous cost associated with twenty-three defendants defending eleven class actions. *See In re Brand Name Prescription Drug Antitrust Litigation,* No. 94 C 897, MDL No. 997, 1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994).

{30} A public benefit was achieved by the settlement to the extent that some North Carolina residents will benefit from the distributions to community health centers. That factor helped to justify the settlement and serves as a justification for the fee awarded herein.

{31} <u>Time and Labor Involved</u>. Analysis of this factor raises a number of questions for which there is little or no guidance in the appellate cases.

{32} 1. <u>Under what circumstances may class counsel in an individual state case be credited with work on other cases in other jurisdictions?</u> In this action, class counsel have not filed any fee request based upon the actual time spent on the North Carolina Action. They have filed information setting forth the total time spent on all the Actions (although that time is not detailed in any fashion from which the court could discern the actual work done or, in the case of many of the firms, by whom). Thus, the fee request in this case raises the questions of when, whether and how individual state courts should treat a "multidistrict litigation" approach to litigation when setting fees in individual state common fund cases. That question cannot be avoided in this situation because it is clear that the amount of time expended in the North Carolina case was insignificant

compared to the time spent in other jurisdictions. [fn3] The nature of the settlement and the fees awarded in other jurisdictions also demand that this question be faced in this case. Indirect purchaser actions are typical of situations where class counsel treat a combination of state court class actions as if they had been assigned as lead counsel in consolidated federal actions by the Judicial Panel on Multidistrict Litigation. (See Persky Aff. para. 1.)

{33} The use of multidistrict class action litigation coordinated across state lines is a developing trend hastened by the retreat from certification of nationwide class actions in the federal courts, particularly in mass tort cases. *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 138 L. Ed. 2d 689 (1997)*; Ortiz v. Fibreboard,* U.S.L.W. 4632 (U.S. June 23, 1999), No. 97-1704, 1999 U.S. Lexis 4373, 1999 WL 412604; *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir. 1998)*;* and *In re Stucco Litigation,* 175 F.R.D. 210 (E.D.N.C. 1997). Publicity attendant to megafees in megafund cases may also have contributed to the interest in creating even larger lawsuits. *In re: Nasdaq Market-Makers Antitrust Litigation*, 1998-2 Trade Cas. (CCH) P72,337, No. 94 Civ. 3996 (RWS), MDL No. 1023, 1998 WL 782020 (S.D.N.Y.) at *24-27, 1998 U.S. Dist. LEXIS 17557 (S.D.N.Y.) at *57-69. At the same time, technology has made coordination of multiple cases in multiple jurisdictions more manageable for class counsel, thereby permitting them to expand the "class" they represent beyond state borders.

{34} It is that unofficial, class counsel-generated expansion of the class beyond jurisdictional borders that creates the most problems for state courts. Most state courts do not have an equivalent to 28 U.S.C. § 1407, which authorizes the Judicial Panel on Multidistrict Litigation. State court jurisdiction seldom extends beyond the state borders. No state court is in a position to manage litigation in other states except, possibly, to coordinate discovery. Forum shopping can become significant, either for trial or settlement purposes. State courts are generally not as experienced or equipped as the federal courts to handle massive cases. State court endorsements of nationwide settlements are more susceptible to challenge in other jurisdictions than federally endorsed settlements because each state has a duty to guard the rights of its citizens and insure that they are not abridged by other state courts. In addition, the substantive law issues are different in each state. That creates a fundamental, unavoidable tension when class counsel attempt to try multiple jurisdiction class action cases as one lawsuit.

{35} As this Court has previously indicated, the most difficult problem created by this multiple state class action approach is the heightened scrutiny required to protect absent class members.

> In the typical class action, absent class members have their interests represented by parties and attorneys that they have not selected. Class representatives and their counsel must not have a conflict of interest if they are to adequately and fairly represent absent class members. The additional blending of the state class members' claims with claims of class members or individuals in other states adds another layer of difficulty. Now, absent class members have the added worries that their claims might be compromised or the amount of their attorney fees from a common fund affected by claims of other parties in other jurisdictions. While there can be many similarities in the causes of action and proof required to establish liability, state laws differ in many respects.

*In re Senergy,* 1999 NCBC 7.

{36} Those difficulties are well demonstrated here where issues of standing and class certification resulted in differing results in different jurisdictions (Appendix A) and different settlement amounts (Appendix B).

{37} The impact of the multidistrict approach is also important in this litigation because class counsel candidly acknowledged in one of the hearings in this matter that the settlement of the North Carolina Action was achieved because of the leverage created by the existence of multiple state cases. Given the failure to obtain favorable rulings on standing or certification in some jurisdictions that participated in the settlement, it is clear that each case was not settled individually, but as a part of the larger whole. Indeed, both defendants and class counsel appear to have insisted on a global settlement, rather than settling each case individually. (Persky Aff. paras. 57-66.) The settlement division between the states attempts in some way to allocate funds

based upon the past history or future chances of success on the merits. (Persky Aff. paras. 68-71.) *See also* Appendix B. What is clear is that the interests of North Carolina class members were inextricably intertwined with the interests of other class members from other states who had differing causes of action and differing potential for success. That entanglement was not voluntary, but imposed upon the class members by the strategy of class counsel. Where class counsel have created multiple jurisdiction class actions, the settlement of which must of necessity be approved in individual state class actions, it is appropriate for each individual state court to look at the contribution which the effort in the other litigation made towards the benefits received by the class members in that individual state. The court is not required to accept all of class counsels' time in other jurisdictions as the lodestar for assessing the appropriateness of the fee request. Each case in each jurisdiction must be decided on its own.

{38} There are clearly instances where work done in a case in one jurisdiction benefits class members in another jurisdiction. Use of discovery conducted in other cases is a good example. Actual judgments obtained in other jurisdictions that facilitate a favorable outcome in another state would be important. Efforts that create estoppel arguments or res judicata rulings are other examples of time and expense that could favorably impact other cases.

{39} In this case, the procedural battles over standing and class certification in other jurisdictions must have consumed much of class counsel's time and expense. The issues in those procedural battles were <u>solely</u> related to application of the laws and legal principles applicable to those jurisdictions and the members of the class in each separate state.

{40} The settlement in this case, which was reached with the twenty-three defendants in eleven jurisdictions on a cost of litigation basis, was driven by the enormous expense resulting from the complexity created by class counsel's multiple jurisdiction approach. By including all their time and expense in the lodestar, class counsel seek credit for creating the complex situation that spawned the settlement and impacted its amount. As Mr. Persky stated at the hearing before this Court on July 23, 1998,

> So we presented to them, by having these [s]tates, having these actions in those [s]tates with indirect purchases, and we presented them with a great problem. And we believe we've negotiated a settlement in an amount which is worth in total more than the sum of its parts, because what they're getting with this settlement, although they're not interrelated expressly, in other words, if your Honor unfortunatelt chose not to approve it, that doesn't mean the other settlements would fall. They're not expressly interrelated. But the amounts that ultimately came out, <u>the total was influenced by the fact that we presented this challenge to them nationwide and it was litigated in a coordinated way by Plaintiff's counsel with that intent.</u> So we did reach an overall settlement in an amount that was a <u>compromise between zero and the hundreds and hundreds of millions of dollars that we would have won</u> *had we been successful.*

(Hearing transcript of July 23, 1998 at 35) (emphasis supplied).

{41} This Court declines to extend credit to class counsel for using the strategy of multiple coordinated class actions *where only a cost of litigation result or its equivalent was achieved.*

{42} The policy behind the Court's decision is based upon the equitable nature of the class action proceeding. Equity should not condone use of the class action procedure simply for leverage in settlement. Courts have historically guarded against use of the class action process solely as a lever to induce settlement. *See, e.g., Cohen v. Beneficial Loan Corp*., 337 U.S. 541, 549-550, 69 S.Ct. 1221, 1227, 93 L. Ed 1528 (1949*); Yaffe v. Detroit Steel Corp.*, 50 F.R.D. 481 (N.D. Ill. 1970); *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371-72 (1966).

{43} The procedural history of the Actions, as well as the nature of the settlement and the amount in this action, dictate that class counsel not be given credit on a lodestar analysis for all the time spent in all the Actions or for creating the complexity which impacted the settlement. To do so would be inequitable and

encourage misuse of multistate class actions.

{44} 2. <u>Is the court required to solicit additional, more detailed information from class counsel regarding the breakdown of their time and expenses for purposes of analysis of their fee request?</u>

{45} Class counsel in this case elected to file a fee request that provided only total hours and some rates for individual attorneys. Little information was provided for the nature of the services or the years of experience of counsel. Instead, class counsel based their fee request upon a theory that the Court should consider all of the time that every lawyer spent in every case in determining the appropriate fee in dividing the North Carolina common fund between the North Carolina beneficiaries of the settlement and class counsel. Class counsel contend that the *nature of the work* done in other jurisdictions is not relevant to the Court's determination, since the settlement covered all jurisdictions and the effort of class counsel was (by election of counsel) coordinated. Class counsel contend that the *amount of the work* is relevant for lodestar purposes. The Court has rejected class counsel's approach.

{46} Should the Court then be required to engage in discovery from class counsel to make further inquiry of the details of their time and expenses? The Court does not believe that it is required to do so in this situation. While the role of class counsel shifts from fiduciary to the class to claimant against the fund when a settlement is reached, the decision with respect to fees is still part of an equitable process. In general, and particularly in this case where there is a *cy-pres* distribution, no attorney is present to represent the beneficiaries of the common fund in the division of the fund between beneficiaries and counsel. It is left to the Court to make the equitable division. Class counsel have an obligation to the Court to provide full and complete details of the time and expenses incurred in representing the class and to do so in an understandable and usable format. If they desire the protection of a confidentiality order they would be entitled to it. They may not simply advocate a theory of compensation and provide only the information that supports their theory. The factors which North Carolina trial courts must consider in determining fee requests in common fund cases are each important, and the court must have full information on all factors, including details of services provided, rates, and experience of counsel, in order to reach an equitable result. In some cases where multiple class counsel from separate jurisdictions are seeking fees in one jurisdiction, it might prove beneficial to the court to have a copy of any fee agreements among counsel for in camera inspection. Full disclosure promotes public confidence in the process and insures against the abuses the North Carolina Supreme Court warned against in *Horner*.

{47} However, the Court has determined that it has sufficient information about the time and expenses of class counsel in this case that supplementation of the record with more detail is not required. More detail is not required because the Court has used the lodestar or time involved only as a check on the appropriateness of fee determined. This is not a case in which the fee should be determined on a lodestar basis.

{48} Using the lodestar as a basis against which the fee determination can be measured does not require more detailed information in this case. In his letter to the Court of January 14, 1999, the Attorney General suggested determining the amount of the lodestar attributable to North Carolina in the following manner:

> Counsel for plaintiff represent that, at their usual billing rates (which reach as high as $490 per hour (Affidavit of Bernard Persky Applicable to Indirect Purchaser Actions, Exhibit V-1)), they have rendered legal services in pursuing the various actions (including the North Carolina action) worth $6,532,537.75 through July 31, 1998 (Persky Affidavit, p. 49), and $7,527,989 through November 30, 1998 (Plaintiff's Memorandum in Support of Final Approval of Partial Class Action Settlement, p. 41). Applying the same factor (13.85%) used by plaintiff's counsel for allocating litigation costs and expenses among the actions (Persky Affidavit, p. 50), the portion of the attorneys' fees lodestar amount attributable to the North Carolina action is $904,756.47 as indicated in the Persky Affidavit, or $1,042,626.40, as suggested by plaintiff's memorandum.

{49} The Court is convinced that the Attorney General's approach is appropriate in this case because the lodestar claimed includes time spent on other Actions and at billing rates higher than the North Carolina

average. (See discussion below). The total fees and expenses awarded by the Court approximate the lodestar amount attributable to North Carolina as determined by the Attorney General. Thus, even if they had not already received 14 million dollars, class counsel are being fully compensated for all of their time and expense allocable to North Carolina. Since the North Carolina Action was the last one filed, the pro rata allocation proposed by the Attorney General is fair.

{50} <u>The novelty and difficulty of the questions involved and the skill requisite to perform the legal services.</u> The North Carolina Action involved both novel and difficult issues. The question of standing was not fully resolved. Class certification issues would have required significant expertise, both legal and financial. The case on the merits would have posed issues requiring significant expertise and an advanced understanding of economics and pricing. The trial of an antitrust case would have been long and difficult. As stated earlier, this case involved pricing of over eight hundred brand name drugs. Garnering proof of pricing policies and establishing a conspiracy among multiple defendants would have required a great deal of expertise. The Court believes class counsel possessed the requisite expertise to address those issues had they been required to do so. However, since the case was settled before those issues were addressed under North Carolina law, no such requirement arose.

{51} <u>The likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer.</u> This factor is not significant in this case. The North Carolina Action was an add-on to the already pending actions in other states. It did not pose a situation which would preclude other employment. Rather, it supplemented a strategy which was already in place.

{52} <u>The customary fee charged in the locality for similar legal services and whether the fee is fixed or contingent.</u> This factor involves Court review of the fee request by comparing it to the customary fee that would be charged in North Carolina for similar services if the fee were determined on both an hourly basis and a contingency basis.

{53} <u>Hourly rates.</u> The first difficulty in making this assessment is the fact that no detail of the services provided can be found in the submission of counsel. Class counsel have approached their fee request from the singular standpoint that it should be decided on the basis of the total dollar amount recovered in all the Actions. Therefore it is difficult to determine the services to which comparison should be made. Did the services include preparation of the fee request? Was the work properly allocated among the lawyers based upon their expertise and billing rates? Was there redundancy resulting from the use of multiple law firms? Those questions cannot be answered from the information supplied by counsel. However, there is information from which the court can compare the rates charged to those customarily charged in the locality. Appendix D attached sets forth the rates charged for certain services as determined by the North Carolina Bar Association Economic Survey 1998, and Appendix C contains class counsels' rates which can be determined from their submission. It is clear from that comparison that North Carolina lawyers would have received far less for the services provided by class counsel. That is not to say that the rates charged by New York counsel for work done in the New York Action were not commensurate with rates charged in that location for similar work. Absent North Carolina class members did not choose to have that work done for them in New York by New York attorneys. The reasonableness of the fee to be charged to North Carolina class members should be evaluated based upon the fees normally charged by North Carolina lawyers for similar services. That comparison indicates that the reasonable charge for similar services by North Carolina lawyers would have been significantly less than that charged by out of state counsel in this case. It is instructive to look at the chart on Appendix C. It shows that the charges by local counsel in the Actions generally fall within the same range as the fees charged by North Carolina lawyers. It is only the charges of class counsel that appear to be substantially in excess of those charged by North Carolina lawyers and local counsel in the Actions. The Court concludes that the lodestar suggested by class counsel has already been enhanced when compared to the customary North Carolina rates.

{54} <u>Contingency analysis.</u> Class actions that create common funds are by their very nature contingency fee cases. The fee in such cases is always subject to court approval. Absent class members may not be bound by the agreement between a class representative they did not choose and an attorney or group of attorneys they did not choose. In multidistrict litigation, they may not be bound by the fee decisions in other jurisdictions. Each jurisdiction must resolve its own case on its own terms. Nor do common fund cases fit the usual

contingency fee analysis. In the usual contingency fee case the lawyer and client have negotiated a fee arrangement, with each choosing the risk they are willing to take and the expense they are willing to incur for a specific reward. Therefore, in common fund cases it is more useful to look at percentage awards in other common fund cases than the contingency fee arrangement that might be negotiated between an individual client and an attorney. Even that approach poses difficulty because each case is decided on its own facts and any number of factors could cause a shift in the percentage applied by the court in a particular case. Mechanical rules simply do not apply when making equitable determinations. *Goodrich,* 681 A.2d at 1048-49. The fee should correlate with the structure of the settlement negotiated by class counsel. In this case, the result was a *cy-pres* distribution that did not benefit the majority of class members and did not result in the change of any business practice which benefited the class. All the settlement did was to put an end to expensive and meritless litigation.

{55} In general, fees range from 6 percent to 35 percent in those cases using a percentage of the fund method. It is also true that the percentage usually decreases as the size of the fund increases. *See In re: Nasdaq Market-Makers Antitrust Litigation*, 1998-2 Trade Cas. (CCH) P72,337, No. 94 Civ. 3996 (RWS), MDL No. 1023, 1998 U.S. Dist. LEXIS 17557, 1998 WL 782020 (S.D.N.Y. Nov. 9, 1998). In *Nasdaq*, the Court found, after a thorough review of extensive case law, that in common fund cases the percentage should decrease as the size of the fund increases. The court noted that fund recoveries in the range of 51-75 million dollars "usually" generate fees in the 13 percent to 20 percent range. Fees drop to a range of 6 percent to 10 percent in larger cases. Some courts have used sliding scales to determine fees. *See, e.g., Branch v. FDIC*, No. Civ.A. 91-CV-1327ORGS., 1998 WL 151249 (D.Mass. March 24, 1998) (memorandum order) (applying 14 percent up to $22 million; 12 percent of the next $10 million, and 5 percent over and above $32 million). There are at least three justifications for altering the percentage as the fund gets bigger. First, it is generally not fifty times more difficult to try a case with a verdict of fifty million dollars than it is to try a case with a one million dollar verdict. *See Report of the Third Circuit Task Force, Court Awarded Attorney Fees,* 108 F.R.D. 237 (1985). Second, the margin for error increases with the size of the fund, requiring courts to exercise their discretion with caution to avoid unjust enrichment of either counsel or the beneficiaries. *See Edwards v. Alaska Pulp Corp*., 920 P.2d 751 (Alaska 1996). Third, and most importantly, the awarding of attorney fees in common fund cases can impact the credibility of the judicial system and the legal profession. *See Horner,* 236 N.C. at 101, 72 S.E.2d at 24; *Kunlein v. Department of Revenue*, 662 So. 2d 309 (1995) (a case heavily relied upon by Judge Manning in his fee decision in the *Smith* case cited above). In *Kunlein*, the Florida Supreme Court articulated its concerns as follows:

> Some time ago, this Court recognized the impact of attorneys' fees on the credibility of the court system and the legal profession when we stated: There is but little analogy between the elements that control the determination of a lawyer's fee and those which determine the compensation of skilled craftsmen in other fields. Lawyers are officers of the court. The court is an instrument of society for the administration of justice. Justice should be administered economically, efficiently and expeditiously. The attorney's fee is, therefore, a very important factor in the administration of justice, and if it is not determined with proper relation to that fact it results in a species of social malpractice that undermines the confidence of the public in the bench and bar. It does more that that. It brings the court into disrepute and destroys its power to perform adequately the function of its creation.

*Id.* at 313 (citations omitted).

{56} The storm of public protest recently created by the fee request in the *Smith* case in this state and the national controversy and adverse media coverage surrounding the fees in the tobacco industry litigation demonstrate the public's interest in and concerns about attorney fees and the administration of justice.

{57} Balanced against the public concern over fee abuse is the strong public interest in encouraging attorneys to take contingency fee cases, particularly in antitrust cases. The Court is fully aware of the chilling effect fee decisions can have on plaintiffs' counsel. As Judge Richard Posner of the Seventh Circuit Court of Appeals stated so clearly:

The award of substantial attorneys' fees to the lawyers for the plaintiffs in a *successful* antitrust class action is important in order to encourage the bringing of such actions. Necessarily, these lawsuits are handled on a contingent-fee basis, and the uncertainty of antitrust law and the complexity of the facts in <u>most antitrust cases create a substantial risk that the lawsuit will fail and the lawyers for the class therefore receive no fee</u>. Because these are big cases, the investment of the attorney's time and effort -- an investment that he loses entirely if the suit is unsuccessful -- is very large; and payment of his fee may be long postponed due to the length of the typical antitrust case. In addition, the <u>successful</u> prosecution of an antitrust case requires highly specialized legal skills and aptitudes that are in great demand by conventional clients. Substantial fees are necessary if the lawyers having these skills are to be induced to devote their attention to the plaintiffs' side in antitrust class actions, rather that to the more secure forms of practice for which their skills equip them.

(Emphasis added.) *Phemister v. Harcourt Brace Javanovich, Inc.,* 1984-2 Trade Cas. (CCH), No. 77 C 39, P66, 234 (N.D. Ill. Sept. 14, 1984).

{58} In the case before this Court, the Court and class counsel have a different perception of success. In this case, the lawsuit esentially failed, but the lawyers have asked for a premium. When class counsel win, they should be rewarded. There must be incentives in order to induce lawyers to take difficult cases. However, when class counsel settle on a cost of litigation basis prior to any test of the merits of their case and do not create any significant benefit for the class, they should not receive the same premium for their work as if they had won. They should be paid reasonably for what they achieved for the class. The Court believes the fee awarded in this case does just that. To award a premium fee for the results in this case might encourage other lawyers to bring meritless but multiple lawsuits in hopes of getting a premium fee for a cost of litigation settlement before achieving any real benefit for the class.

{59} <u>The time limitations imposed by the client or circumstances</u>. This does not appear to be a significant factor in this case.

{60} <u>The nature and length of the professional relationship with the client.</u> This does not appear to be a significant factor. Stacy Lee Long, the class representative, never even appeared at any hearing before this court in the North Carolina Action, which was the last of the actions to be filed.

{61} <u>The experience, reputation and ability of the attorneys.</u> In this case, the Court has found the skills, reputation and abilities of the attorneys who have appeared before it in the North Carolina Action to be excellent. The Court is obviously without the ability to make any judgment with respect to the work of counsel in the other cases.

{62} <u>Risk.</u> This factor is important in this case. Class counsel undertook the first wave of litigation after direct purchaser actions had already begun. By obtaining access to the discovery in the federal MDL action, the potential burden of massive discovery in the indirect purchaser actions was significantly reduced. This is set forth in Mr. Persky's affidavit: "[T]he discovery stipulation gave Class Counsel access to – and the right to use – a voluminous amount of discovery that would have literally cost millions of dollars to generate independently." (Persky Aff. para. 30.) In addition, the existence of the MDL action even facilitated class counsel in finding an expert. (Persky Aff. para 30.) The MDL action was obviously going to trial before any of the indirect purchaser cases, thus insuring that class counsel would know the outcome if they were willing to wait on trial of the federal action before settling. There was a risk that no violation of the antitrust laws could be proven. This case was settled before the risk of failure on the merits was incurred in either the MDL action or any state Action.

{63} There was also a risk that class certification could not be obtained in the individual Actions. That risk was significant. It took employment of an expert to establish that a class or classes could be defined to support the certification request. Certification had been denied in New York, Maine, Michigan and Minnesota. It was uncertain or unlikely in six other jurisdictions and had only been upheld in the District of Columbia. *See*

Appendix A. In North Carolina, class certification had not been ruled upon.

{64} There was also a risk that standing would not be allowed in those states that had not adopted an *Illinois Brick* repealer statute. *See* Appendix A. In North Carolina, standing was more likely because of the decision in *Hyde*, but the Supreme Court had not addressed the issue.

{65} Had class counsel shouldered the burden of the obstacles described above and overcome them, they would have been entitled to a premium for taking the risks. In this case class counsel avoided the future risks and minimized the losses already incurred in the largest states by settling before the trial in the MDL action and before facing class certification contests in other states. They should not be rewarded for a cost of litigation settlement on the same basis as if they had taken the risks associated with certification and trial of the merits and prevailed, or at least obtained a significant settlement compared to the litigation costs or the potential recovery.

{66} <u>The amount involved and the results obtained</u>. The Court has already discussed many of the facts relevant to this factor. A summary of the key facts follows. This was a cost of litigation settlement that was entered into after class counsel had sustained key losses in certification fights in the largest jurisdictions. It was entered into before the trial in the MDL action, thus avoiding the risks associated with a decision on the merits. The amount received, though large, was small when compared to the potential recovery if the case had been tried and won. As the MDL case established, the underlying substantive claims were meritless, and the settlement reflected that fact. The settlement was so meager from the standpoint of benefit to each class member that a *cy-pres* distribution had to be used to dispense the settlement fund. Defendants got a complete release and covenant not to sue, ensuring that they would not have to make any change to their pricing policies which would benefit the class members. The settlement was remarkable in its total amount, but that figure can be attributed to the complexity and costs of the legal entanglement created by pressing eleven class action cases in different jurisdictions against twenty-five large corporations covering eight hundred brand name drugs. To reward class counsel with a premium fee simply for creating a massive legal entanglement would not be in keeping with the equitable principles which apply to use of the class action procedure. Certainly, a cost of litigation settlement entered into before any significant risks are taken in a case does not warrant payment of any premium for class counsel's services.

{67} Ten other jurisdictions have awarded class counsel a premium for the result in this case. While it would be simpler to either say that the 14 million dollars class counsel has already received is more than sufficient for the value created or blindly follow the other jurisdictions and award 25 percent, the decision on the division of the North Carolina common fund should be made independently. This was a separate action brought in the state courts of North Carolina, and it is the benefits received by and work performed for North Carolina class members that are most important.

V.

{68} The fee decision that the court has made in its discretion has the practical effect of fully reimbursing class counsel for all of North Carolina's prorated share of expenses incurred in all the Actions. Class counsel are also almost fully reimbursed for North Carolina's prorated share of the lodestar fees incurred in all the Actions, even though those fees are generally at a much higher rate than would be found in North Carolina and cover activities in other jurisdictions that related solely to legal issues exclusive to those jurisdictions. On a percentage of the fund basis, the fee award amounts to approximately 10 percent of the North Carolina fund remaining after payment out of the fund for notice costs and administration expenses, but before attorney fees and expenses. That percentage is slightly below the low end of the range of fees awarded nationally in cases involving amounts between fifty and seventy-five million dollars. Use of the lower percentage in this case is justified because, among other reasons cited above: (1) the majority of class members did not benefit in any way from the settlement; (2) the case was settled before success on the merits was achieved and after procedural battles had been lost in large states; (3) class counsel's ability to piggy-back the discovery in the direct purchaser actions made it less risky; and (4) the underlying substantive claims lacked merit. No factors justifying a premium were present in this case.

{69} The Court has been informed by class counsel that despite the cap on the fee request, no funds at all

have been distributed to community health centers in North Carolina, but all funds have been held in an interest bearing escrow account pending the Court's ruling on attorney fees. The highest interest rate paid on those funds was 4.5 percent. Accordingly, class counsel will be entitled to interest on the amount of the award for fees and expenses at the rate of 4.5 percent from the date of the final order approving settlement in this case to the date of payment.

{70} Based upon the foregoing, and in the Court's exercise of its discretion, it is hereby **ORDERED, ADJUDGED AND DECREED:**

1. Within thirty days class counsel shall be paid from the common fund fees in the amount of $870,000.00 and expenses in the amount of $91,117.92.
2. Within thirty days class counsel shall also be paid from the common fund interest at the rate of 4.5 percent on the total amount of $961,117.92 from the date of the final order approving settlement through the date of payment.
3. Within ten days of the disbursement to class counsel the balance of the common fund shall be distributed to the National Association of Community Health Centers.
4. Within sixty days of this order, the National Association of Community Health Centers shall file with the Court a report containing its specific plans for distribution of the funds to North Carolina Community Health Centers and a timetable showing when the funds will be distributed. The National Association shall make every effort to reduce the paperwork and bureaucratic delays in the process while insuring the funds are properly allocated.
5. In the event class counsel appeal from this order, an initial distribution shall still be made to the National Association of Community Health Centers in the amount of $6,000,000.00.
6. The Court shall retain jurisdiction of this case to oversee any additional issues concerning attorney fees and expenses or disbursement of the settlement fund.

This the 30th day of July, 1999.

_____

Footnote 1  Separate state court class actions in which class counsel are not involved may be pending in California and Alabama.

Footnote 2  In a letter to the Court dated January 14, 1999, submitted at the request of the Court, the Attorney General offered the following comment on class counsel's fee petition:

> Consistent with our comments in *Ruff v. Parex* (96 CVS 0059, New Hanover County), we believe that the simplistic percentage-of-the-fund approach suggested by plaintiff's counsel is inappropriate in this type of case. Instead, we recommend the multi-factor approach for determining the reasonableness of attorney's fees that the State Bar outlined in its Rule 1.5 (1998) as a more accurate means to assure that the attorney's fees are reasonable and not excessive. This framework was adopted by Judge Howard Manning in *Smith et al. v. State of North Carolina et al.* (95 CVS 6715, Wake County), by Judge Robert L. Farmer in *Faulkenbury v. Teachers' and State Employees' Retirement System, et al.* (90 CVS 12090, Wake County), and by this Court in *Byers et al. v. Carpenter et al.* (94 CVS 04489, 96 NCB 103, Wake County).

Footnote 3  Local North Carolina counsel's time accounts for approximately three-tenths of one percent of the total lodestar submitted by class counsel. (Appendix C.)

_____

# APPENDIX A*

| JURISDICTION | DATE FILED | INDIRECT PURCHASER STANDING | CLASS CERTIFICATION | PROCUDURAL POSTURE |
|---|---|---|---|---|
| New York | 7/13/95 | No | No | Case dismissed for lack of standing. Appeal pending |
| Arizona | 8/29/95 | Def.'s mtn to dismiss for lack of standing denied | Uncertain | Def.'s mtn to dismiss for lack of standing denied |
| Maine | 11/3/95 | No | Denied | Appeal Pending |
| Michigan | 1/20/96 | No | Denied | P's petition for permission to file interlocutory appeal denied |
| Minnesota | 2/21/96 | No | Denied | P's petition for permission to file interlocutory appeal denied |
| D.C. | 2/22/96 | Allowed; Ill. Brick repealer | Granted | |
| Wisconsin | 2/22/96 | Allowed; Ill. Brick repealer | Uncertain | |
| Kansas | 12/6/96 | Allowed; Ill. Brick repealer | Uncertain | |
| Florida | 1/16/97 | Uncertain | Unlikely | |
| Tennessee | 2/24/97 | Uncertain; favorable lower ct. ruling | Uncertain | |
| North Carolina | 6/27/97 | Uncertain; favorable lower ct. ruling | Uncertain | |
| **TOTALS** | | **4 ALLOWED, 4 NOT ALLOWED, 3 UNCERTAIN** | **1 GRANTED, 4 DENIED, 6 UNCERTAIN** | |

* See Affidavit of Bernard Persky of September 14, 1998, at 5-6, 8-13, 16-25, 33-37.

# APPENDIX B

| Jurisdiction | Settlement Amount | Net Settlement Amount | Actual Per Capita Amount of Net Settlement | Potential Damages in millions Over 4.8 years | Per Capita Potential Value | Relationship of Actual to Potential Per Capita Value |
|---|---|---|---|---|---|---|
| AR | $8,409,900 | $8,131,329 | $ 2.06[5] | $157.68 | $39.92 | 5.16% |
| D.C. | 6,925,800 | 6,678,753 | 3.34[5] | 23.18 | 11.59 | 28.82% |
| FL | 8,904,600 | 8,465,521 | .62 | 548.93 | 39.99 | 1.55% |
| KA | 5,441,700 | 5,226,177 | 2.06[5] | 101.38 | 39.99 | 5.15% |
| ME | 989,400 | 868,384 | .70[6] | 49.54 | 39.95 | 1.75% |
| MI | 3,166,080 | 2,948,881 | .31[6] | 378.29 | 39.98 | .78% |
| MN | 1,978,800 | 1,836,833 | .41[6] | 180.86 | 39.98 | 1.03% |
| NY | 1,978,800 | 1,686,833 | .09[6] | 725.90 | 39.99 | 1.03% |
| NC | 8,904,600 | 8,565,521 | 1.23 | 277.92 | 39.98 | 3.08% |
| TN | 7,420,500 | 7,162,945 | 1.41 | 203.76 | 40.00 | 3.53% |
| WI | 10,190,820 | 9,874,434 | 1.96[5] | 201.74 | 40.00 | 4.90% |

**APPENDIX C\***

**LODESTAR ANALYSIS**

**CLASS COUNSEL**

| FIRM | State | Hrs | fee | % tOT FEE | RATE [1] |
|---|---|---|---|---|---|
| Goodkind | New York | 7781.65 | 2,664,541 | 40.8 | **$342.41** |
| Miller | Illinois | 2212.5 | 779,095.25 | 11.9 | **352.13** |
| Zwerling | New York | 3940.1 | 1,219,494 | 18.7 | **309.51** |
| Elwood | Michigan | 2151.25 | 740,785 | 11.3 | **344.35** |

| | | | | | |
|---|---|---|---|---|---|
| Elwood | Michigan | 2151.25 | 746,765 | 11.5 | 344.55 |
| Bainbridge | Ala., Va. | 2157.8 | 639,908.5 | 9.8 | **296.56** |
| Zimmerman | Minnesota | 1027 | 199,111 | 3 | **186.09** |
| **TOTAL** | | 19,270.3 | 6,242,934.8 | **95.5** | **323.97** |

## NORTH CAROLINA COUNSEL

| | | | | | |
|---|---|---|---|---|---|
| **Whitfield** | **North Carolina** | **60** | **10,292** | **0.2** | **171.53** |

## OTHER LOCAL COUNSEL

| | | | | | |
|---|---|---|---|---|---|
| Bader | Colorado[2] | 55.65 | 10,445.75 | 0.2 | 187.7 |
| Bonnett | Arizona | 245.7 | 55,523 | 0.8 | 225.98 |
| La Cava | Wisconsin | 148.48 | 41,587.75 | 0.6 | 280.09 |
| Shockman | Arizona | 204.3 | 34,325 | 0.5 | 168.01 |
| Sando | Wash. D.C. | 87.5 | 22,750 | 0.3 | 260 |
| Niewald | Kansas | 227.7 | 44,526 | 0.7 | 195.55 |
| Berman | Maine | 169.5 | 31,521.25 | 0.5 | 185.97 |
| Hoffman | Maine | 88.4 | 17,680 | 0.3 | 200 |
| Hyman | Michigan | 101.5 | 15,228.75 | 0.2 | 150.04 |
| Sinsheimer | Washington[2] | (51.49) | 7,723 | 0.1 | (150) |

| | | | | | |
|---|---|---|---|---|---|
| **GRAND TOTAL** | | 20,956.22 | 6,532,537.75 | 99.9 | $311.72 |

\* See Appendix of Exhibits to Affidavit of Bernard Persky of September 14, 1998, Exhibit V.

1 These rates are average blended rates. That is, they include work done by attorneys at any level of experience, law clerks, and paralegals. The top hourly rates for class counsel attorneys were as follows: Goodkind, $490; Miller, $455; Zwerling, $445; Elwood, $415; Bainbridge, $395. The top hourly rate for class counsel paralegals was: Goodkind, $145.

2 While lodestar figures for Washington and Colorado were included in class counsel's fee application, neither state was part of the settlement before this Court.

## APPENDIX D

## Comparative Rates for North Carolina Lawyers [1]

**(Typical rates for lawyer during 1997 at highest rate for any size city or firm in North Carolina.)**

| Category | Hourly Rate |
|---|---|
| Lawyers admitted 1991-92 | $148 |
| Lawyers admitted 1987-88 | $176 |
| Lawyers admitted 1983-84 | $201 |
| Lawyers admitted 1977-78 | $250* |
| Antitrust Lawyers | $190 |
| Litigation | $192 |
| Personal Injury - Plaintiff | $244 |
| Securities | $250* |
| Highest hourly rate for law clerks | $72 |
| Highest rate for paralegals | $61 |

1 Figures based on the 1998 North Carolina Bar Association Economic Survey.

* Highest rate on entire survey.

The Court notes that in *Smith v. State of N.C.,* No. 95 CVS 6715 (Wake Co. Sup. Ct. (November 20, 1997)), Judge Manning awarded fees at the rate of $265 an hour for senior attorneys at Womble Carlyle Sandridge and Rice, a large N.C. law firm.

The Court also notes that in *In Re Food Lion Effective Scheduling Litigation*, No. 92-198-MISC-5-F (E.D.N.C.) (April 13, 1995), Judge Fox applied the rate for similar services in the specific locale of *Eastern District* of North Carolina attorneys in determining the proper fee award for class counsel, awarding $160 an hour for attorneys and $35 an hour for paralegals in an employment litigation case.